722 A.2d 960 (1999)
318 N.J. Super. 1
STATE of New Jersey, Plaintiff-Respondent,
v.
Ronald GIBSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted January 6, 1999.
Decided January 21, 1999.
*961 Ivelisse Torres, Public Defender, for defendant-appellant (Alan I. Smith, Designated Counsel, on the brief).
John Kaye, Monmouth County Prosecutor, for plaintiff-respondent (Mark P. Stalford, Assistant Prosecutor, of counsel).
Before Judges STERN, LANDAU and BRAITHWAITE.
The opinion of the court was delivered by *962 STERN, P.J.A.D.
Defendant was indicted for possession of a controlled dangerous substance, "cocaine and/or heroin," N.J.S.A. 2C:35-10a(1) (count two), possession of a controlled dangerous substance, "heroin and/or cocaine," with the intent to distribute, N.J.S.A. 2C:35-5b(3) (count three), and conspiracy to commit the crime of distribution of a controlled dangerous substance, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5 (count four). Co-defendant, Angela M. Traymon, was charged in count one with possession of cocaine, N.J.S.A. 2C:35-10a(1). She was also named in count four.
After denial of his motion to suppress, defendant was tried to a jury and found guilty on counts two and three. A judgment of acquittal was entered on count four at the end of the State's case. Defendant was sentenced to concurrent five year probationary terms on counts two and three. The judge also imposed a V.C.C.B. penalty of $50, a S.N.S.F. assessment of $75 and a D.E.D.R. penalty of $1,000 on each count.
Defendant appeals and argues:
POINT I The Court Erred In Denying Defendant's Motion To Suppress.
(A) Detective Cassidy Did Not Have an Articulable Suspicion To Enter Upon Private Property To Question The Defendant And His Subsequent Seizure Of The Evidence Was Illegal.
(B) The Court Abused Its Discretion In Applying The Concept Of "Abandonment" To The Facts Of This Case.
(C) Detective Cassidy Used His Flashlight To Locate The Evidence.
POINT II Testimony That Police Officer Grant Knew Defendant Was Irrelevant To Any Material Issue And In The Context Of The Trial Was Admitted For An Improper Purpose (Not Raised Below).
POINT III The Court Abused Its Discretion And Deprived The Defendant Of A Fair Trial By Qualifying Detective Cassidy As An Expert In The Area Of Narcotics Distribution Because Detective Cassidy Arrested The Defendant For Possession With Intent To Distribute.
(A) Detective Cassidy Was The Arresting Police Officer.
(B) Detective Cassidy, The Expert, Reinforced The Credibility Of Detective Cassidy, The Arresting Police Officer (Not Raised Below).
POINT IV Defendant's Conviction On Count Two Should Have Been Merged Into The Conviction On Count Three.
Our careful review of the record leads us to conclude that these contentions, except Point IV, are without merit, and that only the following discussion is warranted. R. 2:11-3(e)(2).

I.
The only witness to testify at the motion to suppress hearing was Detective Michael Cassidy. Cassidy, a County Detective since 1986, was assigned to the Tactical Narcotics Team Unit since its inception in 1991. The main objective of that unit "is to arrest individuals who are street-level narcotics violators in known narcotics distribution areas." It is a "high-visibility unit." Its personnel drives "standard unmarked police vehicles," and wear badges around their necks and shirts with the State Police logo.
On January 4, 1994, at approximately 10:18 p.m., Detectives Cassidy, Mayo and another officer were driving through the vicinity of 123 North Fifth Avenue in Long Branch, "a known narcotics area." The area had been identified as such through "surveillance," "narcotics purchases," "intelligence," "prior narcotics arrests" and "numerous complaints," including those via a police "hot line."
On the evening in question, Cassidy observed defendant standing in the driveway of 123 North Fifth Avenue. As the unmarked police car approached, defendant walked down the driveway "towards the street," "looked at the vehicle" and then "turned around and walked back up to the driveway [to] where he was initially standing." The vehicle's "high beams" permitted good visibility.
Cassidy testified that:

*963 Based on my training and experience with narcotics enforcement in drug areas, individuals that sell drugs will stand in a more hidden area, and when a vehicle approaches, they approach the roadway in order to get that oncoming vehicle's attention in case they want drugs.
There were no "barriers" impeding or "limiting access" to, or a view of, the driveway from the street, and upon observing defendant's actions, Cassidy "drove the police car into the driveway," leaving the "tail end of the vehicle" in or near the street. While the vehicle was still in motion and "prior to stopping," Cassidy "observed [defendant] drop an item from his left hand which fell onto the driveway." The car then came to a complete stop and was placed in park. The police had no contact with defendant before Cassidy saw him make the drop. As the officers exited their vehicle, defendant took "one to two steps forward from where he dropped that item."
Cassidy approached defendant and asked his name, to which defendant replied "Ronald Gibson." Defendant was asked why he was in that driveway and why he walked down and back up the driveway when he observed the approaching vehicle. Defendant stated that he lived in the house at 123 North Fifth Avenue, "thought we were somebody else," and "walked back up the driveway" upon realizing his mistake. After defendant stated again that he lived in the adjoining residence, Cassidy stated his belief that defendant, in fact, "resided in the red house across the street," which defendant then admitted. According to Cassidy, defendant "admitted he lived across the street, not at the house he was standing in the driveway of." Cassidy further testified that, although he had never before met defendant, he had knowledge of him because "when we go into certain areas, we make a note of known drug areas, known drug houses, the local drug dealers' names." After speaking with defendant and while Mayo watched defendant, Cassidy walked to the area where he observed defendant drop the item and, with the aid of a flashlight, retrieved the evidence in question.
At the subsequent trial it was developed that the officers observed defendant drop a glove and that Cassidy picked up a small chunk of cocaine, a razor blade and a glove which contained "an additional package" of crack cocaine and heroin. On cross-examination during the trial, Cassidy further stated that the reason for ascertaining defendant's place of residence was that:
It showed that he was not being honest with his replies to my questions. He was attempting to conceal something: the truth.
The motion judge found Detective Cassidy to be "very credible." The judge specifically noted that Cassidy did not "go right over to" the dropped item and did so only after conducting a "field investigation of [defendant]." The judge further stated that confirmation of defendant's residence, and thus his willingness to lie, resulted in "a reasonable suspicion that the explanation that was given was also potentially a fabrication, that he was looking for somebody else in the car and turned around when he found out that it was not that individual."
Based on the facts as set forth by Detective Cassidy, the judge concluded that this was "not a Tucker situation," see State v. Tucker, 265 N.J.Super. 358, 627 A.2d 174 (App.Div.1993), aff'd, 136 N.J. 158, 642 A.2d 401 (1994), and in fact, it was really a "State [v.] Alexander situation of a step-up of the circumstances." See State v. Alexander, 191 N.J.Super. 573, 468 A.2d 713 (App.Div.1983), certif. denied, 96 N.J. 267, 475 A.2d 570 (1984). Citing Tucker, the court found that no coercion, either physical or otherwise, forced defendant to abandon the later seized item that he previously had in his possession. And citing Alexander, the judge stated that, standing alone, Cassidy's experience and the fact that this situation occurred in the "dead of winter, 10:18 at night, [in] a high drug-crime area" would not by itself create an articulable suspicion. However, the judge concluded that the totality of the circumstances, including defendant's "abandon[ment] [of] the item" "before the police did anything or said anything" (other than pulling into the driveway), the "field investigation" resulting in defendant's willingness to lie, and revelation of defendant's identity as an alleged drug dealer, gave rise to "an *964 articulable suspicion" to "[go] over and seiz[e]" the "abandoned" item. The court further held that irrespective of "any articulable suspicion," defendant's constitutional right to privacy was not violated by the police because "the action of pulling into the driveway did not violate [d]efendant's rights."

II.
New Jersey has long recognized that a temporary street-detention based on less than probable cause may be constitutional. In a pre-Terry decision, we recognized that a police officer's duties include vital preventive roles and that reason and common sense dictate "he should clearly have the right to stop persons on the street for summary inquiry where, as here, the circumstances are so highly suspicious as to call for such an inquiry." State v. Dilley, [49 N.J. 460, 464, 231 A.2d 353 (1967) ]. In determining the reasonableness of the detention, we concluded that all factors must be balanced, including the basis of suspicion on the part of the police officer and the nature and extent of the restraint on the individual.

....
In sum, to determine the lawfulness of a given seizure under New Jersey law, it is incumbent upon a reviewing court to evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions. An investigatory stop is valid only if the officer has a "particularized suspicion" based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing. The "articulable reasons" or "particularized suspicion" of criminal activity must be based upon the law enforcement officer's assessment of the totality of circumstances with which he is faced. Such observations are those that, in view of officer's experience and knowledge, taken together with rational inferences drawn from those facts, reasonabl[y] warrant the limited intrusion upon the individual's freedom.
[State v. Davis, 104 N.J. 490, 503-04, 517 A.2d 859 (1986).]
See also State v. Donis, 157 N.J. 44, 63, 723 A.2d 35 (1998) (Stein, J. concurring); State v. Citarella, 154 N.J. 272, 278-80, 712 A.2d 1096 (1998); State v. Arthur, 149 N.J. 1, 7-10, 691 A.2d 808 (1997).
In deciding the validity of an investigatory stop, the evaluating court must "give weight to `the officer's knowledge and experience' as well as `rational inferences that could be drawn from the facts objectively and reasonable viewed in light of the officer's expertise.'" State v. Citarella, supra, 154 N.J. at 278, 712 A.2d 1096 (quoting State v. Arthur, supra, 149 N.J. at 10-11, 691 A.2d 808). In determining whether a reasonable suspicion exists, the court must engage in a factual inquiry as to the observations made by the police at the time of the stop, thereby basing its determination on the totality of the circumstances. See State v. Arthur, supra, 149 N.J. at 11-12, 691 A.2d 808.
In the present case, Cassidy, the only witness at the motion hearing, testified that he observed defendant involved in furtive conduct in a known narcotics area attempting to approach an oncoming vehicle from a hidden area and retreating when he saw who was approaching. Like the trial judge, however, we need not decide whether those observations by themselves gave rise to a "`particularized suspicion' based upon an objective observation" that defendant "has been or is about to engage in criminal wrongdoing," State v. Donis, supra, 157 N.J. at 63, 723 A.2d 35, (Stein, J. concurring), so as to justify an investigatory stop. The fact is that defendant dropped the drugs before there was any investigatory stop or questioning. Thus, the critical question, as the case is presented to us, is whether the police could enter the driveway, even if to make an investigatory stop. For if they could, the events that followed were justified by the observation of defendant dropping an item and walking away from it, independent of his answers to their questions.

*965 A.
Defendant argues that the driveway is a "curtilage" to his residence and that, in any event, he had a reasonable expectation of privacy from unlawful police intrusion on the driveway of the home where he actually lived. Given our holding, we need not examine whether there is any evidentiary basis for the assertion, in connection with the motion to suppress, that defendant lived in the adjoining house. At the trial defendant testified that he was forced to say "I live across the street with my mom [and so said] because I didn't want no problems" with the police. At trial, defendant also testified that "my mother owns both houses that are in question" and that he was living "in the downstairs apartment" of 123 North Fifth Avenue. However, there was no such testimony at the motion to suppress and no evidentiary basis for defendant's curtilage contention. We take this opportunity to remind the parties that on appeal "we may only consider whether the motion to suppress was properly decided based on the evidence presented at that time." State v. Jordan, 115 N.J.Super. 73, 76, 278 A.2d 223 (App.Div.), certif. denied, 59 N.J. 293, 281 A.2d 806 (1971). See also, e.g., Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), regarding the use of a defendant's testimony given on the motion to suppress.

B.
"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967). See also New York v. Class, 475 U.S. 106, 114, 106 S.Ct. 960, 966, 89 L.Ed.2d 81, 90 (1986); State v. Donis, supra, 157 N.J. at 55, 723 A.2d 35. While we have not yet held, as have other courts, that "[a] driveway is only a semiprivate area," United States v. Magana, 512 F.2d 1169, 1171 (9th Cir.), cert. denied, 423 U.S. 826, 96 S.Ct. 42, 46 L.Ed.2d 43 (1975) (finding that the expectation of privacy that one has in a driveway is dependent "upon the nature of activities and the degree of visibility from the street"), it is clear that "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public." California v. Greenwood, 486 U.S. 35, 41, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30, 37 (1988), quoted in State v. Hempele, 120 N.J. 182, 209, 576 A.2d 793 (1990).
Whether an area is "curtilage" of a house depends on "the proximity of the area... to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." United States v. Dunn, 480 U.S. 294, 301, 107 S.Ct. 1134, 1136, 94 L.Ed.2d 326, 334-35, reh'g denied, 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987); accord State v. Ball, 219 N.J.Super. 501, 506-07, 530 A.2d 833 (App.Div.1987) (limiting the applicability of the curtilage concept with respect to the reasonable expectation of privacy in multi-occupancy premises); see also State v. Ford, 278 N.J.Super. 351, 354-57, 651 A.2d 103 (App.Div.1995) (upholding arrest based on observation of drugs secreted in exterior bay window of house by officer who was where any member of the public could see the site). Here, defendant's movement about the driveway, whether it was owned by him, his mother or any other person, was within the public view and observed from the public thoroughfare. Although the driveway was close to the house, the fence along the front of the house did not prevent entrance through the normal and expected use of the driveway, and the driveway was clearly observable from the street. Cf. State v. Ball, supra, 219 N.J.Super. at 507, 530 A.2d 833. Accordingly, defendant could have no reasonable expectation of privacy in the driveway.
Property is abandoned when one "voluntarily discards, leaves behind or otherwise relinquishes his interest in the property in question so that he can no longer retain a reasonable expectation of privacy with regard to it at the time of the search." State v. Farinich, 179 N.J.Super. 1, 6, 430 A.2d 233 (App.Div.), cert. denied, 88 N.J. 497, 443 A.2d 711 (1981), aff'd o.b., 89 N.J. 378, 446 A.2d *966 120 (1982). The trial judge's finding that defendant abandoned the property he dropped on the driveway is supported by sufficient credible evidence in the record. See State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). See also Farinich, supra, 179 N.J.Super. at 4-7, 430 A.2d 233. Moreover, the use of a flashlight does not transform an otherwise reasonable observation into an unreasonable search within the meaning of the Fourth Amendment, United States v. Dunn, supra, 480 U.S. at 304, 107 S.Ct. at 1141, 94 L.Ed.2d at 337; see also United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202, 1204 (1927), or under the New Jersey constitution. State v. Moller, 196 N.J.Super. 511, 515, 483 A.2d 433 (App. Div.1984); see also State v. Alston, 88 N.J. 211, 216, 440 A.2d 1311 (1981) (upholding searches with flashlights).

III.
We agree with defendant that his conviction on count two for possession of a controlled dangerous substance, in violation of N.J.S.A. 2C:35-10a(1), should have merged with his conviction on count three for possession of a controlled dangerous substance with intent to distribute, in violation of N.J.S.A. 2C:35-5b(3). See generally, State v. Rechtschaffer, 70 N.J. 395, 411-12, 360 A.2d 362 (1976); N.J.S.A. 2C:1-8d, e. The State argues to the contrary because the offenses "related to two distinguishable groups of drugs," and the trial judge found there were "two separate, distinct findings on that driveway and in the glove." However, the jury was not instructed that different substances related to different counts, nor did the verdict sheet which asked whether defendant possessed or possessed with intent to distribute "either cocaine or heroin." The judge's charge did not in any way distinguish between the substances relating to either count,[1] and the record suggests that defendant was simultaneously holding all substances (perhaps some inside and some outside the glove) at the time they were dropped. In the absence of a special verdict, we do not know if the jury found that defendant possessed heroin, cocaine, or both, and if cocaine, whether defendant was found to possess all that was retrieved by the police. Nor do we know if the jury found that defendant intended to distribute both substances.[2] Under the circumstances, the convictions must merge. Cf. State v. Strecko, 244 N.J.Super. 463, 582 A.2d 1038 (App.Div. 1990); see also State v. Diaz, 144 N.J. 628, 637-38, 643-44, 677 A.2d 1120 (1996).

IV.
The matter is remanded for entry of a corrected judgment merging count two into count three. The conviction on count three is affirmed.
NOTES
[1] In fact, although a judgment of acquittal was entered on the conspiracy count involving the co-defendant who was not tried with defendant, there were proofs presented concerning her possession of additional cocaine, and the judge charged possession and possession with intent to distribute of "either cocaine or heroin."
[2] There is no claim that an indictment cannot charge possession or possession with intent to distribute one substance "and/or" another. A special verdict can reveal whether the jurors found defendant possessed one or both substances and possessed either or both with intent to distribute. See R. 3:19-1(b); State v. Diaz, supra; State v. Lado, 275 N.J.Super. 140, 158, 645 A.2d 1197 (App.Div.), certif. denied, 138 N.J. 271, 649 A.2d 1290 (1994).