922 A.2d 828 (2007)
393 N.J. Super. 132
STATE of New Jersey, Plaintiff-Respondent,
v.
Ernie LANE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 21, 2007.
Decided May 21, 2007.
*830 Yvonne Smith Segars, Public Defender, for appellant (Jay Bernstein, Designated Counsel, of counsel and on the brief).
Stuart Rabner, Attorney General, for respondent (Michael J. Williams, Deputy Attorney General, of counsel and on the brief).
Before Judges WEFING, C.S. FISHER and MESSANO.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we consider the validity of a warrantless search and seizure that occurred soon after a group of masked men, one of whom was armed with an assault weapon, jumped from a black Lexus and robbed Strauss Auto in Hamilton Township. Acting on a witness's statement that a gold Acura was also driving suspiciously in the area, the police arrived at defendant's home, where they found defendant in the driveway ostensibly working under the hood of a gold Acura that matched the description given. After defendant acceded to a request that he accompany the police to the station house for questioning, one officer remained behind.
The warrantless searches in question then started with the remaining officer's observation of a headband in defendant's backyard from his vantage point on the other side of a wooden fence; the headband allegedly matched a headband worn by one of the robbers. The officer then entered the backyard through what he said was an open gate and examined the headband, which, according to the officer, raised concerns about his safety, and caused him to conduct a protective sweep of the yard. In conducting this sweep, the officer claims to have seen a rifle under a couch through the open door of a shed.
Based on these and other circumstances, we are required to consider whether the *831 trial judge correctly held that the plain view exception permitted admission of the headband and whether the protective sweep exception permitted admission of the rifle. Because we are unable to satisfactorily assess the legitimacy of these searches without more extensive fact finding, we remand to the trial judge for additional proceedings.

I
Defendant was charged in Indictment No. 03-05-0606 with two counts of first-degree robbery (counts one and two), N.J.S.A. 2C:15-1; two counts of theft by unlawful taking (counts three and four), N.J.S.A. 2C:20-3(a); unlawful possession of an assault firearm (count five), N.J.S.A. 2C:39-5(f); two counts of possession of a weapon for an unlawful purpose (counts six and seven), N.J.S.A. 2C:39-4(a); two counts of aggravated assault (counts eight and nine), N.J.S.A. 2C:12-1(b)(4); and theft by receiving stolen property (count ten), N.J.S.A. 2C:20-7. Defendants Sam Livingston, Jovaughn Jordan, Curtis Buck, and Tara Rawls were also charged in the same indictment with the commissions of the same offenses.
Pursuant to a plea agreement, defendant pled guilty to one count of first-degree robbery.[1] The plea agreement was expressly made subject to the outcome of defendant's suppression motion. Defendant also reserved the right to appeal if the judge denied the suppression motion, as did the other defendants, who also pled guilty.[2]
The trial judge partially granted and partially denied the suppression motion in a written opinion rendered on March 8, 2004. Defendant was sentenced a few months after the ruling on the suppression motion. The trial judge imposed a ten-year term of imprisonment, with an 85% period of parole ineligibility, on the robbery conviction, and a concurrent four-year term of imprisonment on the endangering conviction. All other counts in both indictments were dismissed.
Defendant filed an appeal, raising the following arguments for our consideration:
I. DEFENDANT[']S MOTION TO SUPPRESS THE AUTOMATIC RIFLE AND HEADBAND SEIZED IN DEFENDANT[']S BACKYARD SHOULD HAVE BEEN GRANTED WHERE THE ITEMS, (A) [WERE] THE FRUITS OF AN UNLAWFUL ENTRY AND SEARCH OF A CONSTITUTIONALLY PROTECTED AREA WITHOUT A VALID ARREST OR SEARCH WARRANT AND, (B) WHERE NO EXIGENT CIRCUMSTANCES EXISTED TO ENTER THE HOME (BACKYARD). THE COURT VIOLATED THE FOURTH AMENDMENT AND ITS EXTENSION UNDER NEW JERSEY LAW. THEREFORE ALL EVIDENCE MUST BE SUPPRESSED D[UE] TO THE ILLEGAL ENTRY AND ARREST.
II. THE INDEPENDENT SOURCE RULE CANNOT SUSTAIN WHAT OTHERWISE WAS AN IMPERMISSIBLE SEARCH OF DEFENDANT'S HOME (BACKYARD) WHERE THE OFFICERS COULD NOT PROVE, BY CLEAR AND CONVINCING EVIDENCE, [THAT] THEY WOULD *832 HAVE SOUGHT A SEARCH WARRANT OR CONSENT INDEPENDENT OF THE TAINTED KNOWLEDGE OR EVIDENCE THAT THEY PREVIOUSLY HAD ACQUIRED OR VIEWED.
III. A NEW SENTENCING HEARING IS MANDATED BY THE AUGUST 2, 2005 NEW JERSEY SUPREME COURT RULING IN STATE V. NATALE[[3]] STRIKING NEW JERSEY'S PRESUMPTIVE SENTENCING RULES AS UNCONSTITUTIONAL UNDER THE SIXTH AMENDMENT.
Because we conclude that further proceedings are required regarding defendant's suppression motion, we vacate the order denying the motion and remand for further proceedings.

II
In his written opinion, the judge found that, at approximately 9:18 p.m. on September 6, 2002, three black men, wearing hoods and masks, emerged from a black Lexus and approached Strauss Auto on South Broad Street in Hamilton Township; a fourth occupant remained in the vehicle. Two of the men, one of whom was armed with an assault rifle, confronted Strauss Auto's assistant manager; the third remained by the door.
The assistant manager was ordered by the robbers to "give [them] the money." While the assistant manager was in the process of opening the safe, one of the robbers snatched a chain from around the assistant manager's neck and also attempted to rip a bracelet from his wrist. Another robber assaulted the assistant manager, removed the bracelet, and took the cash register tills, containing approximately $2,700. One of the robbers also took $290 from a Strauss Auto employee. A witness to the holdup later advised the police that one of the culprits was wearing what he referred to as a "bandana" or "headband" with a "red logo."
Another witness resided on Genesee Street[4] near Strauss Auto. He indicated to the police that as he arrived home that night he saw parked in front of his home a gold Acura, which drove off as he arrived. Later, he looked out and again saw the gold Acura parked in front of his home. He took down the license plate number of the vehicle as it drove away again. The witness also indicated that he observed the same gold Acura drive by "ten to twelve times," and also saw a black Lexus pass by twice without its headlights on between 9:00 and 9:15 p.m. This witness called the police; according to its records, the Hamilton Police Department received this call at 9:06 p.m. During this phone call, the witness told the police that a "gold Acura bearing New Jersey license plate number MLL87D was riding around the area slowly looking at the caller's house, black male occupant."
At approximately 9:30 p.m., Detectives Richard Braconi and Shannon Mangione arrived at Strauss Auto to investigate. While there, they were advised by the police dispatcher that a "suspicious auto call" had been received several minutes before the robbery. The detectives were advised by the dispatcher that the license plate number provided by the caller indicated that defendant was the vehicle's owner.
The detectives also then learned that defendant was a Strauss Auto employee, *833 but had only been employed there for a few weeks. The assistant manager advised Detective Braconi that defendant had worked the night shift that evening, but had checked out at 8:07 p.m., and that, at approximately 8:55 p.m., he too had observed defendant drive by on South Broad Street, which he thought was "unusual" because defendant had left work only approximately forty-five minutes earlier.
Detectives Braconi and Mangione, together with two other officers, proceeded to the Emmett Avenue address obtained from motor vehicle records. Upon their arrival, approximately sixty or ninety minutes after the robbery, the detectives encountered defendant standing near the open hood of a gold Acura with plate numbers MLL87D. At their request, defendant identified himself; Detective Mangione told defendant that his place of employment had just been robbed. During direct examination, Detective Braconi said that defendant had "no visible reaction" to this news; on cross-examination, he said that at this time defendant also appeared "a little taken back" and "a little bit scared." Detective Mangione asked defendant to accompany her to the police department so that she could speak to him about the robbery. Defendant consented.
Detective Mangione left with defendant; the other two police officers then present also departed. Detective Braconi, however, remained behind.
Evidence adduced at the suppression hearing revealed that a fence encircled defendant's backyard. Photographs marked as exhibits reveal that this fence, which appears to be at least five feet high, consisted of wooden slats vertically placed side-by-side, thus foreclosing the ability of a passerby to see through the fence. Close to the side of the house was a three-foot-wide gate in the fence, which allowed access from the driveway to the backyard.
Detective Braconi testified that the gate was open. During the brief encounter with defendant in the driveway, Detective Braconi had positioned himself in front of the gate "where he could watch [defendant] and not have [Detective Mangione] in the line of fire with me." According to the judge's findings, once all the others had left, Detective Braconi
looked into the yard through the wooden fence gateway and swept the yard with his flashlight. He observed what he believed to be a headband or "bandana" with a reddish logo lying on a concrete walk in the backyard, which, he testified, caused him to think the headband might be the one described by [one of the witnesses to the robbery]. Braconi drew his weapon and proceeded into the backyard to examine the headband. He picked up the headband and concluded the sweatband had been recently worn because it was "still warm."
Detective Braconi then observed an open shed in the backyard and called for assistance. With his weapon drawn, Braconi "looked inside the open shed, vocally identifying himself as a police officer," and scanned the interior with his flashlight. According to the judge, as Detective Braconi "was looking within the shed, [he] saw what he thought to be a semi-automatic rifle lying underneath a nearby couch."
Detective Braconi's visual search of the shed revealed that no one was inside. According to the judge's findings, the detective then "continued his search of the backyard for the other assailants." Finding no one, Detective Braconi then "returned to the shed where he discovered, among other things, a gray headband lying on the armrest of the couch, loose change near a change roll on the couch, a fifty dollar money wrapper on the floor and *834 more loose and torn change rolls on a TV cabinet."
Detective Braconi returned to the driveway and searched a trash can "located next to the house and just outside the gate opening." Inside the can was a large brown plastic bag; Detective Braconi testified that he discerned from the outline of the objects within that opaque bag that its contents were "similar to cash register tills." With the aid of his flashlight, Detective Braconi then claims to have examined the interior of the brown plastic bag "through a small rip in the bag." He allegedly confirmed that the objects within the opaque bag were cash register tills, and opened a larger rip in the bag to further confirm this fact.
Detective Braconi and another officer who had arrived then went to the front door of the home and obtained consent from defendant's mother to search the interior of the home. Mrs. Lane directed the officers to her son's room, where they found $298 in currency. There is no evidence in the record that the officers felt compelled to conduct a protective sweep of any part of the interior of the home.
Later, when confronted with the evidence seized from his home, defendant acknowledged his involvement in the robbery and implicated the other defendants.
The suppression motion required that the judge consider the bases urged by the State to justify, chronologically: the warrantless search of the backyard during which the officer observed, in plain view, a headband that allegedly fit the description provided by a witness to the robbery; the warrantless search of the shed, during what the State claims was a legitimate protective sweep, which resulted in the seizure of an automatic rifle; the warrantless search of a trash can and the search of an opaque plastic bag within the trash can, which resulted in the seizure of cash register tills; and a second warrantless search of the shed, which produced another headband, coin wrappers and coins.
The judge granted the motion to suppress the cash register tills and the evidence seized from the second search of the shed; the judge denied the motion to suppress the rifle and the headband. Since defendant did not argue in the trial court that the consent search of the interior of the home, which produced $298 in cash, was unlawful, and since the State has not appealed the granting of the motion to suppress the cash register tills and the evidence obtained from the second search of the shed, our review is limited to the judge's determination that the plain view exception to the warrant requirement rendered lawful the seizure of the headband, and that the right to conduct a protective sweep justified the warrantless search of the shed and the seizure of the weapon contained therein.

III
The Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution require that "police officers obtain a warrant before searching a person's property, unless the search falls within one of the recognized exceptions to the warrant requirement." State v. Cassidy, 179 N.J. 150, 159-60, 843 A.2d 1132 (2004). Because the "sanctity of one's home is among our most cherished rights," State v. Frankel, 179 N.J. 586, 611, 847 A.2d 561 (2004), the search of a person's home "must be subjected to particularly careful scrutiny . . . because physical entry of the home is the chief evil against which the wording of the Fourth Amendment" is directed, State v. Cassidy, supra, 179 N.J. at 160, 843 A.2d 1132 (internal quotes omitted). As held in Silverman v. United *835 States, 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 L.Ed.2d 734, 739 (1961), an unauthorized entry into the home "by even a fraction of an inch" is too much.
A warrantless search is presumed invalid, and places the burden on the State to prove that the search "falls within one of the few well-delineated exceptions to the warrant requirement." State v. Pineiro, 181 N.J. 13, 19, 853 A.2d 887 (2004) (quoting State v. Maryland, 167 N.J. 471, 482, 771 A.2d 1220 (2001)). The State argues that the plain view exception authorized the warrantless search of defendant's backyard, which resulted in the seizure of a headband. The plain view doctrine first requires the officer to "lawfully be in the viewing area." State v. Johnson, 171 N.J. 192, 206, 793 A.2d 619 (2002) (citing Coolidge v. New Hampshire, 403 U.S. 443, 465-68, 91 S.Ct. 2022, 2037-39, 29 L.Ed.2d 564, 582-84 (1971)). Second, the discovery of the evidence must be "inadvertent," meaning that the officer "did not know in advance where evidence was located nor intend beforehand to seize it." State v. Bruzzese, 94 N.J. 210, 236, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). And, third, the officer must have probable cause to associate the property with criminal activity. Texas v. Brown, 460 U.S. 730, 738, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502, 511 (1983) (plurality opinion).[5]

A
A determination of the first prong of this test  whether Detective Braconi had a right to be where he could make his observation of the headband, State v. Johnson, supra, 171 N.J. at 208, 793 A.2d 619  requires consideration of the scope of the curtilage to this home. As our Supreme Court has recognized, it is well settled that "[c]ertain lands adjacent to a dwelling called the `curtilage' have always been viewed as falling within the coverage of the Fourth Amendment." Ibid. (quoting 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 2.3(f) (3d ed. 1996)).
The boundaries of the curtilage are defined by four factors, namely: (1) "the proximity of the area . . . to the home"; (2) "whether the area is included within an enclosure surrounding the house"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." United States v. Dunn, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326, 334-35 (1987). See also State v. Domicz, 188 N.J. 285, 302, 907 A.2d 395 (2006); State v. Johnson, supra, 171 N.J. at 208-209, 793 A.2d 619. The trial judge's opinion does not contain findings as to all these factors.
There is no dispute, however, that the headband was located within an enclosure immediately adjacent to the home. The record does not reveal the nature of the uses to which this area was put, but the record gives no reason to doubt that the owner's use of this area  as demonstrated by the encircling impervious wooden *836 fence  was intended to be kept private from observations by passersby. In short, the record permits no dispute about the fact that the area in which the headband was found was within the curtilage and subject to the protection of the Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution.
That the item seized is found within the curtilage, however, does not foreclose the applicability of the plain view exception. The curtilage may include certain "semi-private areas," where visitors would be expected to go, such as walkways, driveways and porches. State v. Johnson, supra, 171 N.J. at 209, 793 A.2d 619 (quoting LaFave, supra, § 2.3(f)). "Observations made from such vantage points are not covered by the Fourth Amendment." Ibid. Accordingly, the seizure of an item seen within the curtilage is not invalid if the officer had a right to be at his vantage point, such as a semi-private area or on the street.
The trial judge found credible the testimony of Detective Braconi that, while standing on the driveway near an open gate in the fence surrounding the backyard, he saw with the aid of a flashlight, a headband in plain view. Bound by the finding that the officer was standing on the driveway at this time, State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999), we are required to conclude that the officer was in a "semi-private area" where a visitor might be expected to go and what he may have seen in plain view from that vantage point, even with the aid of a flashlight,[6] would not preclude a finding that the first prong of the plain view exception was met.

B
The second prong of the plain view exception requires that consideration be given to whether the item in question was observed "inadvertently." This prong will be satisfied when the police "did not `know in advance the location of the evidence and intend to seize it,' essentially relying on the plain-view doctrine only as a pretense." State v. Johnson, supra, 171 N.J. at 211, 793 A.2d 619 (quoting Coolidge v. New Hampshire, supra, 403 U.S. at 470, 91 S.Ct. at 2040, 29 L.Ed.2d at 585). Here, the trial judge's decision gave no clear expression to his consideration of this prong. The judge did not indicate whether Detective Braconi's observations were inadvertent or were a mere "pretext" for exploring defendant's backyard in the hope of discovering, in plain view, evidence to satisfy his curiosity about defendant's involvement in the robbery.
The evidence adduced at the suppression hearing indicates that, at the time Detective Braconi began looking through the open gate of the fence with his flashlight, defendant had already been escorted from the area by other officers. Nothing in the record reveals the reason or reasons why Detective Braconi may have remained behind at defendant's residence. The ostensible reason for being there in the first placeto speak to defendanthad ended with defendant's departure.
*837 We observe that the record supports a finding that the officers had a valid reason to be at defendant's home and to be in the semi-private area of the driveway, where they briefly spoke with defendant. A police officer is entitled to go to a person's home to interview him. In that undertaking, the police may approach defendant's front door and, if necessary, they may approach another door, United States v. Daoust, 916 F.2d 757, 758 (1st Cir.1990) (Breyer, J.), and, it seems, may approach more than one possible entrance at the same time, State v. Domicz, supra, 188 N.J. at 301, 907 A.2d 395. It has been held upon receiving no response to a knock on the door, the police may look through a window to see if anyone is home, United States v. Hersh, 464 F.2d 228, 230 (9th Cir.), cert. denied, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972), although at this point the line of demarcation between what is reasonable or unreasonable within the meaning of the Fourth Amendment becomes quite blurred, see, e.g., People v. Camacho, 23 Cal.4th 824, 98 Cal.Rptr.2d 232, 3 P.3d 878, 884-87 (2000). If, on these occasions and for these purposes  as opposed to simply looking through a window for criminal activity, see, e.g., Texas v. Gonzales, 388 F.2d 145, 147 (5th Cir.1968)[7] an officer should see something that might generate probable cause to believe that a visible item constitutes evidence of criminal activity or contraband, a warrant will not be required. In short, the police, when rightfully in a particular location, are not required to avert or close their eyes to keep from seeing what might constitute evidence of criminal activity or contraband. See State v. Bruzzese, supra, 94 N.J. at 237, 463 A.2d 320.
Here, we are presented with different circumstances than those cases in which the police inadvertently observe in plain view evidence of a crime when approaching or while at a home to speak with a suspect. Here, the police had already conversed with defendant. They had already secured his agreement to accompany them to the station house. And defendant had been driven away from the premises. By that time, the headband had not been seen in plain view. Instead, once defendant and the other officers had departed, Detective Braconi remained behind and decided to scan defendant's backyard with a flashlight.
At the hearing, Detective Braconi provided no reason for his peering into the backyard after defendant and the other officers had left the premises. Although asked this question on more than one occasion during cross-examination, Detective Braconi only responded that his visual search of the backyard occurred as the other officers were in the process of leaving, as if to suggest that he was also about to leave when he just happened to conduct this impromptu search.[8] Defense counsel's question was highly relevant and defendant was entitled to more than the officer's non-responsive answer. Defendant was entitled to know whether there was any principled reason for Detective Braconi's deliberate scanning of the backyard with his flashlight after the interview was over and after defendant had left the premises. In addition, the parties were also entitled to the judge's finding as to *838 whether Detective Braconi's search of the backyard was "inadvertent" or whether he delayed departing from the premises as a "pretext" to conduct a warrantless search. No such finding was ever rendered.
As a result, we find it necessary to remand the matter for additional findings regarding this prong of the plain view exception.

C
The third prong requires a determination of whether it was "immediately apparent" that the item seen in plain view was related to criminal activity, which, as we observed earlier, requires a determination of whether the officer had "probable cause to associate the property with criminal activity." Texas v. Brown, supra, 460 U.S. at 738, 103 S.Ct. at 1541, 75 L.Ed.2d at 511.
The judge found that Detective Braconi saw a headband with a "reddish" logo, some fifty feet away, which "caused him to think the headband might be the one described" by a witness to the robbery. That finding is consistent with what Detective Braconi said during his testimony, but it did not account for his testimony that so little of the insignia on the blue headband identified by him at the suppression hearing was red. The judge should make a finding on the credibility of Detective Braconi's claim that his inadvertent scan of the backyard with his flashlight would have allowed for the inadvertent observation of a headband that matched the headband described by a witness to the robbery.
In sum, the third prong required that the judge consider the factual circumstances in the context of the definition of probable cause provided by the Court in State v. Johnson:
"Probable cause exists if at the time of the police action there is a `well grounded' suspicion that a crime has been or is being committed." It requires nothing more than "a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." The flexible, practical totality of the circumstances standard has been adopted because probable cause is a "`fluid concept  turning on the assessment of probabilities in particular factual contexts  not readily, or even usefully, reduced to a neat set of legal rules.'" Probable cause "merely requires that `the facts available to the officer would warrant a man of reasonable caution in the belief' . . . that certain items may be contraband . . . or useful as evidence of a crime, it does not demand any showing that such belief be correct or more likely true than false."
[171 N.J. at 214-15, 793 A.2d 619 (citations omitted).]
The judge's written decision does not contain the findings required by this prong.

D
To summarize, we conclude that we are not presently in a position to determine whether the judge correctly found that the plain view exception to the warrant requirement was met when Detective Braconi visually scanned defendant's backyard with the use of a flashlight after defendant had already been driven away from the location by other officers. We remand for additional findings, and, if necessary, additional testimony regarding the second and third prongs of the applicable test.

IV
Because of the uncertainty regarding the application of the protective *839 sweep exception and whether its reach extends to these circumstances, and because the judge's findings do not answer many relevant questions posed by the search of defendant's shed, we will also vacate the judge's denial of the motion to suppress the rifle and remand for further proceedings.
The sweep of defendant's backyard commenced with Detective Braconi having found and examined the headband in defendant's backyard. That allegedly prompted Detective Braconi to conclude, based upon the information provided by a witness at Strauss Auto, that this could have been the headband worn by one of the robbers. He testified that as this connection formed in his mind, it caused him to believe there was a danger posed by being present in defendant's backyard. That is, Detective Braconi testified that he believed the presence of the headband suggested that one or more of the participants in the robbery may have been near; he also indicated that he was conscious of the fact that the assault weapon allegedly utilized during the robbery had not been located and other robbers were still at large. He drew his weapon and took steps to insure that no one was hiding in the area. It was during the course of this search that Detective Braconi said he looked through an open door in the backyard shed with the aid of his flashlight; he claimed that a rifle was visible underneath a couch within the shed.
The State does not argue that the search of the shed, which uncovered the rifle, was justifiable under any exception to the warrant requirement other than the right of an officer to conduct a protective sweep. Indeed, the testimony adduced during the suppression hearing does not lend itself to any other known exception to the warrant requirement. The judge concluded that Detective Braconi was entitled to conduct a protective sweep and that the rifle was located within the legitimate course of that sweep.
In speaking for the Court in Maryland v. Buie, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276, 281 (1990) (emphasis added), Justice White defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others." Because defendant had not been arrested at or about the time that the searches in question occurred, the immediate question posed by the State's argument in this appeal concerns whether the "protective sweep" represents a legitimate basis for a warrantless search when not an "incident to an arrest."
It is noteworthy that the State can find no express support for its position in the Buie opinion itself. Throughout the opinion, the Court never once defined the contours of a "protective sweep" without invoking the phrase "incident to an arrest" or otherwise referring to the fact that the police had entered Buie's home to arrest him or the fact that the sweep was performed to protect from danger "those on the arrest scene." Maryland v. Buie, supra, 494 U.S. at 334, 110 S.Ct. at 1098, 108 L.Ed.2d at 286 (emphasis added).
In the years since Buie, the Court has not determined whether the protective sweep may form a basis for a warrantless search when not incident to an arrest. Our Supreme Court also has not had occasion to determine whether the doctrine should be expanded beyond the express limits of Buie. The federal courts of appeals, however, have considered the issue on numerous occasions and with mixed results. Some circuits, relying upon the express limits in the Buie Court's language, have concluded that the protective sweep must occur at the time of an arrest. See United States v. Torres-Castro, 470 *840 F.3d 992, 996-97 (10th Cir.2006) (observing that its prior decisions define a protective sweep as "a brief search of premises during an arrest"); United States v. Waldner, 425 F.3d 514, 517 (8th Cir.2005) (declining "the government's invitation to extend Buie beyond an arrest situation"); United States v. Reid, 226 F.3d 1020, 1027 (9th Cir.2000) (holding that a protective sweep could not be upheld because the occupant of the apartment that was searched "was not under arrest"). Other circuits have concluded that there is no such per se requirement that the sweep be incident to an arrest and have permitted the admission of evidence obtained from a sweep in other circumstances. See United States v. Miller, 430 F.3d 93, 100 (2d Cir.2005) (holding that "the effectuation of an arrest . . . is not the sine qua non of a permissible protective sweep"), cert. denied, ___ U.S. ___, 126 S.Ct. 2888, 165 L.Ed.2d 916 (2006); United States v. Martins, 413 F.3d 139, 150 (1st Cir.) (holding that "police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry"), cert. denied, ___ U.S. ___, 126 S.Ct. 644, 163 L.Ed.2d 520 (2005); United States v. Gould, 364 F.3d 578, 586 (5th Cir.) (en banc) (holding that "an in-home protective sweep is not necessarily or per se invalid . . . merely because it is not incident to an arrest"), cert. denied, 543 U.S. 955, 125 S.Ct. 437, 160 L.Ed.2d 317 (2004).
After careful consideration of the matter, we conclude that an arrest should not be the sine qua non of a legitimate protective sweep and that to hold otherwise would place undue importance on the particular facts in Maryland v. Buie and show too little regard for the important public policy of insuring police safety. As the Supreme Court has observed, it is "dubious logic" to conclude that "an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it." United States v. Knights, 534 U.S. 112, 117, 122 S.Ct. 587, 590, 151 L.Ed.2d 497, 504 (2001). Adhering to this approach, we agree with the logic of those federal decisions that have determined that the validity of the warrantless sweep does not turn on the officer's possession of an arrest warrant or the right to arrest, but turns instead on the officer's right to be in a location that generates a reasonable articulable suspicion that the area to be swept "harbors an individual posing a danger" to those on the scene. Maryland v. Buie, supra, 494 U.S. at 337, 110 S.Ct. at 1100, 108 L.Ed.2d at 288.
This result is propelled, in particular, by the fact that the Buie Court itself concluded that its decision was informed by the limited right officers have to conduct a brief patdown for their own safety in street encounters with pedestrians, as in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and during roadside encounters with motorists, as in Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), neither of which requires probable cause or the issuance of an arrest warrant. See Maryland v. Buie, supra, 494 U.S. at 332, 110 S.Ct. at 1097, 108 L.Ed.2d at 285 (holding that "[t]he ingredients to apply the balance struck in Terry and Long are present in this case"). And, although our Supreme Court has not considered the issue presented in this appeal, the Court has previously emphasized the "weighty interest in officer safety" in considering, for example, the propriety of the issuance of a "no-knock" search warrant. State v. Jones, 179 N.J. 377, 406, 846 A.2d 569 (2004) (quoting Maryland v. Wilson, 519 U.S. 408, 413, 117 S.Ct. 882, 885, 137 L.Ed.2d 41, 47 (1997)). This same policy interest  of particular importance *841 when the high number of assaults on police officers in the line of duty is considered, see State v. Jones, supra, 179 N.J. at 406, 846 A.2d 569  requires our holding that there is no per se arrest requirement in determining the legitimacy of a protective sweep.
This holding, however, does not end our inquiry. Instead, whether the police had the right to conduct a protective sweep  although not limited to being incident to an arrest  remains governed by a number of factors, including: whether the sweep occurs within the home or elsewhere; the lawfulness of the presence of the police in the area where the sweep occurs; and whether the police had a reasonable articulable suspicion that the area to be swept, in the words of Maryland v. Buie, supra, 494 U.S. at 337, 110 S.Ct. at 1100, 108 L.Ed.2d at 288, "harbors an individual posing a danger" to those on the scene.
In considering whether the police may rightfully sweep a particular area, it is noteworthy that the matter at hand differs in this regard from the circumstances in Maryland v. Buie and the other federal decisions cited above. All those cases considered the legitimacy of a protective sweep within the home, a fact not insignificant in such matters, as Justice White indicated in his opinion for the Court in Maryland v. Buie:
[U]nlike an encounter on the street or along a highway, an inhome arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.
[Id. at 333, 110 S.Ct. at 1098, 108 L.Ed.2d at 285.]
Notwithstanding the absence of any prior decisions that permit a protective sweep beyond the four walls of a dwelling place, we decline to adopt a hard-and-fast rule that would preclude a protective sweep of the curtilage of a home. In certain circumstances, an officer who has legitimately entered a fenced-in area would be entitled to conduct a protective sweep for persons who may pose a danger. Although in many such instances, the degree of danger may be less than that posed by being within a dwelling place, we conclude that the admissibility of evidence found during such a sweep is not automatically precluded by the fact that it was found outside the home itself. The fact that a location may have provided a lesser degree of concern about the officer being "ambushed" by one of defendant's alleged confederates is simply a factor to be applied in considering the legitimacy of the search.
A court must also consider whether the police were lawfully in the area where the sweep occurs. Fundamental to determining the legitimacy of a protective sweep is the notion that the police may not illegally enter or remain in the area in which the sweep is performed. See, e.g., United States v. Gould, supra, 364 F.3d at 587. In the matter at hand, this factor initially turns on the findings that the judge must make regarding the application of the plain view exception and the admissibility of the headband. Should the judge determine that Detective Braconi had no right to peer through the opening in the fence into the backyard, then it follows that he had no right to enter the backyard; and, if Detective Braconi had no lawful right to be in the backyard, then any evidence found by him in the course of the following protective sweep would be inadmissible.
The third point regarding the location of the protective sweep concerns whether the officer had a reasonable articulable suspicion that the area to be swept posed a *842 danger. Since, unlike the circumstances considered in the federal decisions we have referred, the suspect located at the premises was already in the company of the police, an application of this factor requires that the court consider whether Detective Braconi had cause to believe the backyard area was dangerous. Cf. State v. Eckel, 185 N.J. 523, 537, 888 A.2d 1266 (2006).
This factor may be impacted by numerous circumstances. For instance, although we have held that the sweep may occur even when no arrest is to be made, the absence of an arrest is a highly relevant factor. Here, the officers had engaged defendant in a brief discussion near the location of the later sweep. There is no evidence in the record to suggest that the officers believed that defendant then posed a danger. There is no evidence in the record to indicate that any officer conducted a Terry frisk of defendant at that time. And, the fact that defendant was not placed under arrest strongly suggests that at that time the officers did not have probable cause to believe defendant had committed a crime. In weighing these and all other relevant circumstances, the judge must make a finding as to whether Detective Braconi had at hand "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, supra, 494 U.S. at 334, 110 S.Ct. at 1098, 108 L.Ed.2d at 286.
Other facts relating to whether Detective Braconi had a reasonable articulable suspicion that would permit the protective sweep include whether it was likely that another suspect might have been in the area. True, as Detective Braconi testified, the assault weapon used during the robbery had not yet been accounted for. True, also, the witnesses to the robbery had indicated the involvement of four individuals, who had left the robbery scene in a black Lexus and the fact that these culprits were still at large. But, there is no evidence in the record to indicate that the black Lexus was located at or near defendant's residence at the time of this search. And, although there was an indication from witnesses that the gold Acura in defendant's driveway was also seen driving suspiciously near Strauss Auto at or about the time of the robbery, there was no evidence to suggest to Detective Braconi at the time that anyone other than defendant was in the gold Acura at or around the time of the robbery. Accordingly, the judge should express whether it was reasonable from these facts for Detective Braconi to assume that one or more of the other culprits were in defendant's backyard or shed after further examining and considering again all relevant circumstances.
In addition, Detective Braconi testified that his concern for his safety was triggered by the headband and the fact that it was "still warm," which suggested that it had recently been worn by someone who had discarded it there. As we have observed, the information provided by a witness to the robbery was that the headband had a "reddish logo." The headband identified by Detective Braconi at the suppression hearing had a logo which apparently contained very little red material. The judge should reassess and state whether it was reasonable for Detective Braconi to link the headband he claims to have seen in the backyard with the headband described by the witness. Moreover, although the judge may have implicitly accepted the credibility of Detective Braconi's testimony, he should explain in his findings on remand the reasons why he found Detective Braconi's claim that the headband was "still warm" to be credible *843 and logical. In assessing these and any other relevant facts, the trial judge must also consider and state whether it was reasonable for Detective Braconi to assume that the shed in defendant's backyard  the door of which, according to Detective Braconi, was wide open  harbored someone who may have posed a danger to him.
In addition, the judge must consider whether the officer had embarked on a mission untethered to constitutional principles or whether he was pursuing a legitimate purpose. We remain particularly struck by the fact that defendant had already departed the premises, as had all other officers. In our view, despite being asked on more than one occasion during cross-examination to explain why he remained behind, Detective Braconi never gave a responsive answer but instead repeatedly asserted that he looked into the backyard with his flashlight as the others were leaving. This point should be thoroughly examined and considered on remand, as should the related question of whether the exigency later claimed as a basis for conducting the protective sweep was "police created." If Detective Braconi was merely off exploring the backyard to satisfy his curiosity and, in pursuing that course, created what he later claimed to be an exigent circumstance justifying his protective sweep of the backyard and shed, the weapon must be suppressed. State v. Hutchins, 116 N.J. 457, 468-77, 561 A.2d 1142 (1989); see also State v. Penalber, 386 N.J.Super. 1, 13, 898 A.2d 538 (App.Div.2006) (holding that "[i]f the police had sufficient time to obtain a warrant, and the alleged exigent circumstances were `police created,' the evidence obtained as a result of a warrantless entry must be suppressed"); State v. De La Paz, 337 N.J.Super. 181, 196, 766 A.2d 820 (App. Div.) (holding that "[p]olice-created exigent circumstances which arise from unreasonable investigative conduct cannot justify warrantless home entries"), certif. denied, 168 N.J. 295, 773 A.2d 1158 (2001).[9]
Maryland v. Buie also held that the protective sweep must be narrow to be legitimate, i.e., the search for danger must be "cursory" and limited to those areas "where a person may be found." The judge should further explain whether and why it was reasonable for Detective Braconi to conclude that the shed was likely to have contained a person who posed a danger.
Lastly, Maryland v. Buie imposes time limitations on such a sweep. It may "last no longer than is necessary to dispel the reasonable suspicion of danger." Id. at 335-36, 110 S.Ct. at 1099, 108 L.Ed.2d at 287. And, the sweep may last no longer than the police are justified in remaining on the premises; as stated in Maryland v. Buie with regard to the circumstances there presented, the sweep may last "no longer than it takes to complete the arrest and depart the premises." Id. at 336, 110 S.Ct. at 1099, 108 L.Ed.2d at 287.
Because the judge did not have the benefit of this analysis of what is required of a protective sweep, and because his findings do not include a discussion of many of those things which are critical to a consideration of the lawfulness of this warrantless *844 search, we remand for additional testimony and findings.

V
For these reasons, we vacate the order denying suppression of the headband and the rifle, and we remand for further proceedings in conformity with this opinion. As a result, we need not reach the other issues raised in this appeal and we do not retain jurisdiction.
NOTES
[1] Defendant was also charged in Indictment No. 03-08-0886 with various sex offenses. He pled guilty to fourth-degree endangering the welfare of a child.
[2] We have decided the appeals filed by defendants Livingston (A-0120-04T4), Jordan (A-2958-04T4), Buck (A-1047-04T4) and Rawls (A-0026-04T4) in separate unpublished opinions also filed today.
[3] State v. Natale, 184 N.J. 458, 878 A.2d 724 (2005).
[4] Genesee Street runs parallel to South Broad Street; the back of Strauss Auto faces Genesee Street.
[5] Coolidge v. New Hampshire, supra, 403 U.S. at 470, 91 S.Ct. at 2040, 29 L.Ed.2d at 585, had held that this third element required that it be "immediately apparent" to the officer that the item seen in plain view was evidence of a crime, contraband or otherwise subject to seizure. Coolidge's description was viewed in the plurality opinion in Texas v. Brown, supra, 460 U.S. at 740, 103 S.Ct. at 1542, 75 L.Ed.2d at 513, as "excessively narrow[]," and was redefined by the plurality as requiring that the officer have "probable cause to associate the property with criminal activity." The Court later adopted the Texas v. Brown plurality view in Arizona v. Hicks, 480 U.S. 321, 327, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347, 354-55 (1987).
[6] The Court also concluded in State v. Johnson, supra, 171 N.J. at 210, 793 A.2d 619 (quoting Texas v. Brown, supra, 460 U.S. at 740, 103 S.Ct. at 1542, 75 L.Ed.2d at 512), that the "use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection." As we stated in State v. Gibson, 318 N.J.Super. 1, 11, 722 A.2d 960 (App.Div.1999) (quoted with approval in State v. Johnson, supra, 171 N.J. at 210, 793 A.2d 619), "the use of a flashlight does not transform an otherwise reasonable observation into an unreasonable search within the meaning of the Fourth Amendment or under the New Jersey Constitution."
[7] For example, in Texas v. Gonzales, the court held that, in such a circumstance, the police have no right to look through a window simply for the purpose of seeing if drug activity was occurring inside.
[8] There is no evidence in the record that would suggest that, as he was leaving, the beam of Detective Braconi's flashlight was accidentally directed into the backyard and that he serendipitously observed the headband as a result.
[9] The judge may also require that evidence be provided regarding whether the Hamilton Police Department then had any procedures, written or otherwise, regarding an officer's entry into a location such as defendant's enclosed backyard, without backup, and with knowledge that one of the robbers was in possession of an assault weapon. The judge should consider whether Detective Braconi departed from any relevant procedures and how that would impact upon the reasonableness of his course of conduct.