FRANCIS ESPOSITO, EXECUTOR (ESTATE OF ANTHONY ESPOSITO) *v.* CPM INSURANCE SERVICES, INC.

ANTHONY ESPOSITO, EXECUTOR (ESTATE OF JOANN ESPOSITO) *v.* CPM INSURANCE SERVICES, INC.

Superior Court, Judicial District of New Haven

File Nos. CV-04-4010919S, CV-04-4010920S

Memorandum filed February 9, 2006

*Sette & Bonadies PC*, for the plaintiff in each case.

*Lustig & Brown LLP*, for the named defendant et al. in both cases.

*Gesmonde, Pietrosimone & Sgrignari, L.L.C.*, for the defendant Lawrence Sgrignari, for the defendant Lawrence Gagliardi.

*Alexander Scheirer Law Firm*, for the defendant Aleksandr Rodov.

BLUE, J. The common-law doctrine that a cause of action for personal injuries cannot be assigned is so old that its origins, medieval or earlier, can no longer be ascertained. Modern courts have struggled to articulate both the current boundaries and the current purpose of the doctrine. See *Gurski* v. *Rosenblum & Filan, LLC*, 276 Conn. 257, 266–80, 885 A.2d 163 (2005). The consolidated motions for summary judgment now

before the court require an articulation of these boundaries in a case of first impression.

Briefly put, the question is this. An employee of a pizza delivery company kills two people in an automobile accident while delivering pizza. The car driven by the employee is not owned by the company and, for that reason, not covered by the company's insurance policy. The company's insurer refuses to defend the company in the wrongful death actions brought by the estates of the victims. The company subsequently settles the actions by confessing to judgment. In return for a promise by the plaintiff estates not to execute that judgment, the company assigns to them its right to bring an action against the company's insurance agents for the agents' allegedly negligent advice concerning coverage. Is this assignment lawful? For the reasons subsequently set forth, the answer to this question is in the affirmative.

I

## PROCEDURAL HISTORY

This case arises out of a tragic automobile accident. On August 10, 2001, in Hamden, a car driven by Aleksandr Rodov collided with a car driven by Anthony Esposito. Both Anthony Esposito and his wife, Joanne Esposito, a passenger in his car, died as a result of injuries suffered in the crash. Rodov was an employee of a corporation called Mario's Inc. (Mario's), which did business as Mario's Pizzeria & Ristorante. The car driven by Rodov was not owned by Mario's.

In 2002, the respective executors of the Espositos' estates (executors) commenced wrongful death actions against Rodov and Mario's. *Esposito* v. *Rodov*, Superior Court, judicial district of New Haven, Docket No. CV-02-460504S; *Esposito* v. *Rodov*, Superior Court, judicial district of New Haven, Docket No. CV-02-462417. Mar-

io's was insured by Penn Millers Insurance Company (Penn Millers), but the Penn Millers policy (policy) did not cover the accident in question because the vehicle which Rodov was driving was not owned by Mario's. On March 11, 2002, Penn Millers notified Mario's in writing that "[t]here is no coverage for the allegations set forth in the [executors'] complaint. Therefore, there is no duty to provide a defense." This situation left both Mario's and the executors in obvious difficulty.

The difficulty was resolved as follows. The cases against Rodov were settled for the limits of his personal insurance policy. (The amount of this settlement does not appear in the record.) The cases against Mario's were settled by a somewhat more elaborate procedure, reflected in two written documents placed in each file and a transcript of consolidated proceedings before the court, *Arnold, J.* The documents, entitled "Stipulation" and "Settlement Agreement, Release and Assignment," were executed and filed on July 20, 2004. The proceedings before *Arnold, J.*, occurred on the same date. In these various submissions, Mario's agreed that judgments could enter against it in the respective amounts of $500,500 (in Docket No. CV-02-0460504) and $502,500 (in Docket No. CV-02-0462417). The executors agreed that they would not seek to enforce the judgments just entered. In return for this promise, Mario's agreed to assign to the executors its right to bring an action for negligence against its insurance agents, identified as CPM Insurance Services, Inc., J. F. Canning & Associates, and James Canning (collectively referred to as agents). Judgment entered accordingly in both files on July 20, 2004.

The cases now before the court were commenced by service of process on July 26 and 27, 2004. There are two cases, identical except for the identity of the plaintiff. *Esposito* v. *CPM Ins. Services, Inc.*, is brought by the

executor of the estate of Anthony Esposito. *Esposito v. CPM Ins. Services, Inc.*, is brought by the executor of the estate of Joann Esposito. (For unexplained reasons, the first name of the female decedent is spelled "Joanne" in the underlying action against Mario's and "Joann" in the case now before the court.) The defendants in each case are the agents. The sole count in each case alleges negligence. It specifically alleges that the agents were negligent and breached their standard of care to Mario's in failing to advise Mario's properly of necessary and appropriate insurance coverage and to obtain coverage to cover nonowned automobiles used in conducting its business.

The agents filed the motions for summary judgment now before the court on July 19, 2005. The motions contend that "the assignment of the claim by the defendants' former insurance client, Mario's . . . to the plaintiff is not valid and, as such, the defendants are entitled to judgment as a matter of law." The motions were argued on February 6, 2006. The agents filed a postargument letter brief on February 8, 2006.

II

DISCUSSION

The attitude of the common law concerning assignment of choses of action has altered considerably over the years. In Blackstone's time, "no *chose* in action could be assigned or granted over, because it was thought to be a great encouragement to litigiousness, if a man were allowed to make over to a stranger his right of going to law." 2 W. Blackstone, Commentaries on the Laws of England 442 (1766). The origins of this doctrine are obscure. Coke thought that the purpose of the doctrine was to avoid maintenance, for otherwise "pretended titles might be granted to great men, whereby right might be trodden down, and the weak oppressed." E. Coke, The First Part of the Institutes of

the Laws of England 214a (1628). Dean Ames opined that the doctrine was traceable to the more universal principles that "a *chose* in action always presupposes a personal relation between two individuals" and that "a personal relation in the very nature of things cannot be assigned." J. B. Ames, "The Disseisin of Chattels," 3 Harv. L. Rev. 337, 339 (1890). But, whatever its origins, "[t]he objection of maintenance at length gave way before the modern commercial spirit." Id., 341.

The "modern commercial spirit" began to stir on both sides of the Atlantic shortly after Blackstone penned his Commentaries. The earliest case reflecting this spirit appears to have been decided in Connecticut. In *Fowler* v. *Harmon* (Conn. Super. Ct. 1772), described in *Redfield* v. *Hillhouse*, 1 Root 63, 64 (Conn. Super. Ct. 1774), an assignee of a note payable in grain was allowed to recover for the wrongful taking of the grain. The evolving judicial view was more fully articulated by the Court of King's Bench in *Master* v. *Miller*, 100 Eng. Rep. 1042 (K.B. 1791), aff'd, 101 Eng. Rep. 205 (Ex. 1793), when that court upheld the right of an assignee of commercial paper to bring suit on the note. The sense of the common-law doctrine articulated by Coke appeared "very questionable" to the court. Id., 1053. Anticipating the view of modern economists, the court explained that "[c]irculation and the transfer of property are the life and soul of trade, and must not be checked in any instance." Id., 1054.

*Fowler* and *Master* were commercial cases involving causes of action founded on contract. In 1793, the Connecticut Superior Court announced, without explanation, that an action "founded in tort and not on contract . . . was not transferred by [an] assignment." *Stanley* v. *Duhurst*, 2 Root 52, 53 (Conn. Super. Ct. 1793). The idea, subsequently articulated by the English Court of Exchequer, was that the assignee of a tort victim ought not be allowed "to make a profit of a man's wounded

feelings." *Howard* v. *Crowther*, 151 Eng. Rep. 1179, 1180 (Ex. 1841). The distinction between tort and contract, however, turned out to be far too blunt an instrument to implement this articulated purpose.

The Connecticut Supreme Court was confronted with this difficulty in *Whitaker* v. *Gavit*, 18 Conn. 522 (1847). Clark, a shipbuilder, had a claim against Williams, a client, for intentionally mutilating a model of a propeller. This was a claim in tort. Clark became insolvent, and his claim was eventually assigned to Whitaker. Whitaker subsequently sued Williams, citing the assigned chose in action. Unhappily, the assignment itself was poorly drafted, and a majority of the Supreme Court eventually decided that title to the chose in action had not, in fact, passed. But the fact that the chose in action before the court was a tort was not itself controlling. *Howard* v. *Crowther*, supra, 151 Eng. Rep. 1179, was cited, but without explicit approval. The court stated instead, "We have a strong impression, that the chose in action, which is here the subject of controversy, would have passed, had it been in the assignment." *Whitaker* v. *Gavit*, supra, 528.

The statement from *Whitaker* just quoted is unaccompanied by a rationale. It is unclear whether the court was inclined to reject existing law on the subject, should a proper case of assignment be presented, or was simply inclined to narrow the scope of unassignable actions. A half-century later, it adopted the latter approach. In construing Connecticut's insolvency statutes, the court stated, "[T]he insolvent estate should have the benefit of all rights of action belonging to the assigning debtor, for injuries affecting his property, whether they be founded in contract or tort." *Lovell* v. *Hammond Co.*, 66 Conn. 500, 509, 34 A. 511 (1895). *Whitaker* was cited for this proposition. Id. This, of course, is a useful way to categorize *Whitaker*, for while the chose in action in that case was a tort, and thus unassignable under

eighteenth century jurisprudence, it was a tort claiming injury to property rather than person. As the nineteenth century closed, it seemed reasonably clear that causes of action, whether in contract or tort, based on injuries to property were assignable. Causes of action based on injuries to the person remained unassignable.

This distinction survived a well-known pair of cases decided by our Supreme Court in the second half of the twentieth century. In *Berlinski* v. *Ovellette*, 164 Conn. 482, 325 A.2d 239 (1973), the court held that an uninsured motorists carrier could not be subrogated to its insured's claim against an uninsured tortfeasor. In support of its holding, the court cited the common-law rule that "a cause of action for personal injuries cannot be assigned . . . ." Id., 485. In *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 672 A.2d 939 (1996), the court overruled *Berlinski*, explaining that there was "no logical reason to permit a tortfeasor to be unjustly enriched by virtue of having its debt paid by the insurance company of a party who had the foresight to obtain insurance coverage . . . simply because the insurance company was not permitted to participate in a suit against the tortfeasor in order to recover the money that it had paid to its insured but which was properly paid by the tortfeasor." Id., 372–73. In the court's view, "equitable subrogation is not the equivalent of the assignment of a personal injury action . . . ." Id., 374–75. Once again, while causes of action based on injuries to the person are unassignable, a cause of action based on injury to property interests stands on a different footing.

A trio of recent decisions in this area must now be examined.

In *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 681 A.2d 293 (1996), a case with (as will be seen in a moment) obvious relevance here, the court

upheld the enforceability of a stipulated judgment under which an insured assigned to an injured party the insured's claims against its insurer in exchange for the injured party's agreement to seek satisfaction of the judgment solely against the insurer. White, a framing contractor, had obtained an insurance binder from Goodwin, Loomis and Britton, Inc., for a general commercial liability policy with Maryland Casualty Company as the carrier. Black's decedent was killed while working on the job. When Black sued White, Maryland Casualty Company denied coverage. White subsequently stipulated to a judgment of $500,000 (the policy limit) and assigned its rights against Maryland Casualty Company to Black in return for Black's agreement to seek satisfaction of the judgment solely against Maryland Casualty Company. The court held this stipulated judgment "not void as contrary to public policy." Id., 155. It explained, "[W]hen an insurer has refused to defend its insured, it is in no position to argue that the steps the insured took to protect himself should inure to the insurer's benefit." (Internal quotation marks omitted.) Id., 154. The court was "satisfied that the right of the insurer to challenge the settlement entered into by its insured on grounds of fraud, collusion or unreasonableness provides it with ample opportunity to contest the propriety of such a settlement." Id., 155.

In *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 698 A.2d 859 (1997), the court construed General Statutes § 31-293 (a), which authorizes employers who have made workers' compensation payments to employees injured by third parties to take action to recover those payments from those third parties, as allowing employers to intervene in third party tort actions between injured employees and wrongdoers but not in actions between injured employees and their uninsured motorists carriers. The court noted the common-law rule that "a cause of action for personal injur-

ies cannot be assigned . . . ." (Internal quotation marks omitted.) Id., 382. It then stated: "The ability of someone other than the injured party, e.g., the employer, to bring or to intervene in an action against a third party is a clear deviation from the common law." Id., 383. *Dodd*, however, was a statutory construction case and did not involve an assignment in the first place, so, aside from its reminder that the common law prohibits assignments of causes of action "for personal injuries," its relevance to the present case is limited.

The court's recent decision in *Gurski* v. *Rosenblum & Filan, LLC*, supra, 276 Conn. 257, is more pertinent. Gurski, a podiatrist, filed a voluntary petition for bankruptcy under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq. He was subsequently sued by Lee, a patient, for malpractice. Gurski was represented in the legal action by the law firm of Rosenblum and Filan, LLC. A default judgment entered against Gurski after the law firm failed to attend a pretrial conference. Pursuant to a Bankruptcy Court order, Gurski assigned Lee his estate's interest in a legal malpractice claim against the law firm. The Connecticut Supreme Court, on review, held, "[P]ublic policy considerations warrant the barring of an assignment of a legal malpractice action to an adversary in the underlying litigation." Id., 279–80.

*Gurski*'s reasoning in reaching this conclusion was narrow rather than sweeping. The court began by noting the traditional distinction between the assignability of contract and tort claims, "at least when the claim is based on personal injury." Id., 267. But "[b]ecause an action for legal malpractice can be pleaded either in contract or in tort," neither of these labels was deemed "helpful . . . ." Id., 267–68. "[T]he better approach," the court explained, "is to resolve the issue uniformly on the basis of public policy." Id., 268.

The "public policy" point on which *Gurski* actually turned was specific to the case. The court was "not persuaded that every voluntary assignment of a legal malpractice action should be barred as a matter of law." Id., 273. The court was persuaded, however, that such actions should not be assignable "when, as here, the assignment is to an adverse party in the underlying action." Id., 276. The expressed policy concern with respect to such assignments is that they "necessitate a duplicitous change in the positions taken by the parties in [the] antecedent litigation." (Internal quotation marks omitted.) Id., 277.

*Gurski* was particularly influenced in this regard by the analysis of *Zuniga* v. *Groce, Locke & Hebdon*, 878 S.W.2d 313 (Tex. App.), writ refused, 38 Tex. Sup. Ct. J. 104 (Tex. 1994). *Zuniga* involved plaintiffs in a product liability action who settled with the defendant in return for assignment of the defendant's cause of action for malpractice against its attorney. That assignment was held invalid because it necessarily involved "a demeaning reversal of roles." Id., 318. The Texas court reasoned that, in the underlying action, the plaintiffs' position was that they had a valid tort case and would win on the merits even if the defendant's lawyer represented the defendant capably. "But," the court explained, "to prove proximate cause in the legal malpractice case, the [plaintiffs] would have to take the contrary position: we would have lost our tort case and [the underlying defendant] would have prevailed if its lawyers had capably defended our suit." Id. Citing this analysis, our Supreme Court concluded: "This counterintuitive claim and reversal of roles, requiring the assignee to bring a claim for legal malpractice when she was the very party who benefited from that malpractice in the underlying litigation, would engender a perversion that would erode public confidence in the legal system." *Gurski* v. *Rosenblum & Filan, LLC*, supra, 276 Conn. 278. For this reason, the assignment in question was barred by public policy.

It is now necessary to work through the maze of case law to decide the case at hand. Prior to *Gurski*, the jurisprudence of this area was taxonomic. Causes of action based on contract claims were assignable, while tort claims "based on personal injury" were not. Tort claims based on injuries to property interests occupied a gray area, but *Whitaker, Westchester Fire Ins. Co.* and *Black* strongly suggested that such claims were assignable.

In *Gurski*, however, the court was confronted with an assignment of a tort claim based on an injury to property interests that presented policy problems not present in the court's earlier jurisprudence. The wrong to Gurski, whether it be characterized as tort or contract, was plainly to his property interests rather than his person. He had not suffered a personal injury in, say, an assault or an automobile accident. Rather, a judgment had entered against him, and he was, consequently, responsible for the payment of a sum of money. It was his bank account rather than his limbs that were injured. In this regard, his claim was akin to the claim at issue in *Whitaker*. If, as the court's earlier decisions suggested, the operative distinction is one between claims involving injury to property and claims involving injury to the person, Gurski's claim should have been assignable. But public policy considerations arising from the peculiar dynamics of the case pointed the other way. The assignment of a legal malpractice action to an adversary in the underlying litigation necessitates the role reversal of parties; parties who in their preassignment roles trumpet the merits of their side and in their postassignment roles claim that they could only win because of the incompetence of the opposing lawyer. An assignment under these circumstances "creates a distortion that the profession cannot endure and thus should not tolerate." *Gurski* v. *Rosenblum & Filan, LLC*, supra, 276 Conn. 280.

In reaching this conclusion, *Gurski* did not suggest that it was restricting, or even reexamining, its earlier decisions in *Whitaker, Westchester Fire Ins. Co.* and *Black*. The proper reconciliation of the resulting corpus of judicial decisions cannot be said to be a matter entirely free from doubt. The most logical interpretation to be drawn from *Gurski* is as follows. Contract rights remain freely assignable. Id., 266. Tort claims "based on personal injury" remain unassignable. Id., 267. The gray area of tort claims based on injury to property interests is not subject to a similar categorical rule. The assignability of claims of this description must be resolved "on the basis of public policy." Id., 268.

The public policy reason that prevented the assignment in *Gurski* is not present in the case now before the court. *Gurski*, as mentioned, turned on the "counterintuitive . . . reversal of roles" necessarily accompanying the assignment of a legal malpractice claim to an adversary in litigation. That assignment requires a party to switch from "I would have won on the merits" to "I would have lost on the merits but for the negligence of my opponent's attorney." The claim against the agents in the case now before the court involves no such role reversal. This is because of the peculiar dynamics of insurance coverage.

The claim assigned here is that, "Rodov's automobile would have been insured but for the negligence of the agents." Prior to assignment, this claim would have been made by Mario's. Following assignment, it will be made by the executors. Had the assignment not been made, however, the executors would have had a natural interest in saying the very same thing. This is because plaintiffs in negligence cases naturally desire deep pockets from which to satisfy judgments. On this issue, the interests of plaintiffs precisely coincide with the interests of defendants, who have a stake in having plaintiffs succeed on claims covered by insurance. See

*Higgins* v. *State Farm Fire & Casualty Co.*, 894 So. 2d 5, 17 (Fla. 2004).

An additional layer of complexity must, however, be considered. The assignment in question here was made not after a verdict in a contested trial on the merits in the underlying automobile accident litigation but as part of a pretrial settlement of that litigation. Had the underlying case gone to trial, the possibility exists that Mario's would have contested the case by saying: "Rodov's car was not responsible for the accident in the first place." Had that theory prevailed at trial, there would have been either no judgment against Mario's or a reduced judgment due to comparative negligence, thus altering the claim for damages now made against the agents. But while such an outcome would have altered the damages in dispute here, it would not have altered the claim for liability. That is because Mario's insurer not only refused coverage, it also refused to defend. Even following a defendant's verdict, Mario's would retain a potential claim for damages against the agents based on its costs of defense.

In consequence, there *is* a potential role reversal here, but it is a reversal involving damages rather than liability. As to liability, both Mario's and the executors have an interest in saying both before and after the assignment that "Rodov's automobile would have been insured but for the negligence of the agents." No consequence of the assignment will alter these positions. On the question of damages, the executors' natural interest is similarly unchanged by the assignment. Their wish to obtain substantial damages to be collected from a deep pocket does not alter with the identity of the defendant. But Mario's interest as to damages *will* alter as a result of the assignment. Had the underlying case "remained fully adversarial to the end"; *State Farm Fire & Casualty Co.* v. *Gandy*, 925 S.W.2d 696, 719 (Tex. 1996), Mario's would have had an interest in minimizing

both the amount of the damages awarded to the executors and its (Mario's) responsibility for those damages. But once it has assigned its claim against the agents and agreed to a judgment that will never be executed against it, Mario's is unlikely to be concerned with such matters.

The issue of damages must consequently be addressed. If the question of damages in the present case were to be determined by ascertaining what judgment, if any, would have been rendered against Mario's, or what settlement Mario's would have agreed to, had it remained individually liable to the executors, a forceful argument could be made that such a question could never be answered with acceptable accuracy. Once Mario's has changed positions, the dynamics of the fact-finding process will inescapably alter, and it becomes "very difficult to determine what might have been." Id.

This is not, however, how the question of damages is to be determined under Connecticut law. Mario's and the executors have agreed upon a monetary settlement. *Black* teaches us that "the appropriate method" by which to address the possibility that the settlement was obtained by fraud or collusion is to allow the agents "to contest the stipulated judgment on the ground that it was improperly obtained." *Black* v. *Goodwin, Loomis & Britton, Inc.*, supra, 239 Conn. 154–55. The right of the agents "to challenge the settlement entered into by [Mario's] on grounds of fraud, collusion or unreasonableness provides [them] with ample opportunity to contest the propriety of such a settlement." Id., 155. Moreover, a *Black* hearing along these lines would be fully adversarial and would involve no role reversal. The executors would continue to fill their natural role of attempting to maximize damages, and the agents (who are themselves represented by insurance defense

counsel) would experience no role reversal in attempting to minimize damages.

*Black*, to be sure, was a case against an insurer that had refused to defend its insured. The present case is one against insurance agents. But the allegation against the agents (which, it must be emphasized, has yet to be proved) is that they were negligent and that their negligence brought about a situation in which the insurer, like the insurer in *Black*, will be in no position to argue that the steps that Mario's took to protect itself should inure to their benefit. See id.

For the reasons discussed previously, the "role reversal" issue that invalidated the assignment in *Gurski* is not sufficiently problematic to invalidate the assignment now before the court. Moreover, nothing akin to the "sanctity of the attorney-client relationship," a point of obvious concern to *Gurski*, is at issue here. The Florida Supreme Court has explained: "Attorneys and clients have a confidential relationship, which includes constraints upon information that can be disclosed to others. . . . The law does not impose similar constraints on communications between an insurance agent and an insured. The relationship between an attorney and client is a fiduciary relation of the very highest character, and the attorney owes a duty of undivided loyalty to the client. . . . While an insurance agent is required to use reasonable skill and diligence in obtaining coverage for an insured, the agent also owes the insurance company, which is his or her principal, an obligation of high fidelity. . . . The relationship between an attorney and a client is also a personal one. An attorney may not substitute another attorney in his or her place without the client's permission. In contrast, insurance agents are often substituted without prior notification to the insured." (Citations omitted.) *Forgione* v. *Dennis Pirtle Agency, Inc.*, 701 So. 2d 557, 560 (Fla. 1997).

The Florida Supreme Court's analysis persuasively explains why considerations applicable to the special nature of legal services do not apply here. See General Statutes § 38a-702m (a) providing that, upon appointment, an insurance agent acts "as an agent of an insurer . . . ." While the agents contend in their postargument letter brief that "it is the standard practice of the industry for an insurance carrier to receive [the policyholder's approval] before allowing the business to be moved from one agent to another," they acknowledge that no Connecticut statute or regulation requires this practice. Under our law, unless a particular contract prohibits it, insurance agents can be substituted without prior notification to the insured. This is one example, among many, of a self-evident fact. The insurance agent-client relationship is a commercial relationship not comparable to the attorney-client relationship, shaped by centuries of tradition and jurisprudence. See *Troost* v. *Estate of DeBoer*, 155 Cal. App. 3d 289, 297, 202 Cal. Rptr. 47 (1984); *Daugherty* v. *Blaase*, 191 Ill. App. 3d 496, 500, 548 N.E.2d 130 (1989).

Given these considerations, it is unsurprising that the majority of courts that have considered the issue have concluded that a cause of action against an allegedly negligent insurance agent is assignable. See *Stateline Steel Erectors, Inc.* v. *Shields*, 150 N.H. 332, 334–35, 837 A.2d 285 (2003) (collecting authorities). No consideration of public policy precludes the same conclusion here.

The agents finally argue that, issues of public policy aside, the assignment in question was prohibited by § L of the business owners common policy conditions attached to the policy. Section L states that Mario's "rights and duties under this policy may not be transferred without [Penn Millers'] written consent." No evidence of such written consent has been submitted. The short answer to this contention is that the executors do not seek to recover under the policy. They concede

that the policy does not cover the incident in question, and they claim that the agents were negligent precisely because of that fact. Section L does not preclude the assignment in question.

## III

## CONCLUSION

The motions for summary judgment are denied.