ALGONQUIN POWER INCOME FUND; Algonquin Power Corporation, Inc.; Algonquin Power U.S. Holdings, Inc.; Algonquin Power Fund (Canada), Inc.; and Algonquin Power Systems, Inc., Adversary Defendants–Appellants,

v.

CHRISTINE FALLS OF NEW YORK, INC. and Trafalgar Power Inc., Adversary Plaintiffs–Appellees.

No. 6:07–CV–1258.

United States District Court, N.D. New York.

Oct. 25, 2011.

Menter Rudin & Trivelpiece, Jeffrey A. Dove, Esq., James C. Thoman, Esq., of Counsel, Syracuse, NY, for Algonquin Power Parties.

Harris Beach PLLC, Paul J. Yesawich, III, Esq., Laura W. Smalley, Esq., of Counsel, Pittsford, NY, David M. Capriotti, Esq., of Counsel, Syracuse, NY, for Trafalgar Power Parties.

## MEMORANDUM–DECISION and ORDER

DAVID N. HURD, District Judge.

### I. INTRODUCTION

On March 30, 2010, the Judgment entered on November 6, 2008, was vacated in accordance with the direction of the United States Court of Appeals for the Second Circuit. *See Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.,* 362 Fed.Appx. 151, 152 (2d Cir.2010) (summary order) (*"Algonquin III"*), *vacating & remanding* 396 B.R. 106 (N.D.N.Y.2008) (*"Algonquin II"*), *affirming* 377 B.R. 32 (Bankr.N.D.N.Y.2007) (*"Algonquin I"*). The Court of Appeals found that, rather than applying the doctrine of collateral estoppel regarding claims Algonquin Power Income Fund; Algonquin Power Corporation, Inc.; Algonquin Power U.S. Holdings, Inc.; Algonquin Power Fund (Canada), Inc.; and Algonquin Power Systems, Inc. (collectively "Algonquin") made against the escrowed proceeds of an engineering malpractice judgment ("malpractice escrow") received by debtors in bankruptcy Christine Falls of New York, Inc. and Trafalgar Power, Inc., (collectively "Trafalgar"), the merits of Algonquin's claim of a security interest in the malpractice judgment proceeds held by Trafalgar should have been considered. *Id.* at 156. Decision on the merits was reserved.

### II. BACKGROUND

Only the facts necessary for consideration of the merits of Algonquin's security

interest claim are set forth to provide context for the analysis. Further details as to the facts and procedural history are set forth in the prior decisions, familiarity with which is assumed. *See Algonquin III*, 362 Fed.Appx. 151; *Algonquin II*, 396 B.R. 106; *Algonquin I*, 377 B.R. 32; *see also Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 396 B.R. 584, 586–87 (N.D.N.Y.2008) (collecting cases), *relief from judgment denied* 414 B.R. 22 (2009), *aff'd in part & vacated in part sub nom, Christine Falls Corp. v. Algonquin Power Fund, Inc.*, 401 Fed.Appx. 584 (2d Cir.2010) (summary order) (also affirming in part and vacating in part 427 F.Supp.2d 202 (N.D.N.Y.2006)).

In the mid–1980's Trafalgar developed six hydroelectric power plants in upstate New York. Trafalgar procured interim financing for the development,[1] and then in 1988 secured permanent financing in the amount of $22.5 million from Aetna Insurance Company ("Aetna"). *Algonquin I*, 377 B.R. at 33. The parties executed an indenture agreement and a Consolidation, Extension, Spreader and Modification Agreement ("Consolidation Agreement") to close the financing deal.

In 1996 the Aetna loan was restructured with the execution of an Extension and Modification Agreement ("Modification Agreement") and an Amended and Restated Collateral Trust Indenture[2] ("Indenture"). *Id.* The restructured loan was secured by two notes, which Algonquin eventually purchased. *Id.* at 33 & n. 1.

Meanwhile, in 1989 Trafalgar brought suit against the engineering firm and one of its engineers who designed the power plants, alleging engineering malpractice ("malpractice claim"). *Id.* at 33–34. In 1999 the engineering malpractice lawsuit culminated in a jury award of $7.6 million in favor of Trafalgar, and an award of interest pursuant to a decision of the United States Court of Appeals for the Second Circuit. *Id.* at 34. Trafalgar and the engineering firm stipulated to a judgment amount of $11.1 million, which was paid in January 2001 ("malpractice judgment"). *Id.*

Trafalgar assigned its interest in the malpractice judgment to one of its affiliates, Pine Run Virginia, Inc. ("Pine Run"). In August 2000, Algonquin brought suit against Trafalgar and Pine Run, inter alia, challenging Trafalgar's assignment of its interest in the malpractice judgment to Pine Run, based upon its own purported prior security interest in the malpractice claim.[3] *Id.* In February 2001, an order was entered in that case granting Algonquin's motion for a preliminary injunction precluding Trafalgar from assigning or otherwise disposing of the malpractice judgment proceeds. *Id.* (citing *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F.Supp.2d 341 (N.D.N.Y.2001) (McCurn, J.)).

On August 27, 2001, Trafalgar and its affiliates filed for Chapter 11 bankruptcy protection in the Eastern District of North

---

1. The plants were constructed in 1987.

2. The original 1988 agreement regarding the loan, granting Aetna a security interest in certain property of Trafalgar, was also in the form of an indenture. *Id.* at 35 & n. 5. The "parties agree that for the purposes of this matter there is no material difference between the" original indenture and the revised indenture entered into in 1996. *Id.* at 35 n. 5. Therefore, 1996 revised indenture will be referenced and cited simply as "Indenture." Pinpoint citations will be to the ECF document page. The Indenture is in the Appellants' Record on Appeal, Docket No. 3–9 (Defts.' Ex. 10 Pt. 1). Further details about the Indenture will be set forth in the analysis.

3. That action is case number 5:00–CV–1246, consolidated with case number 5:99–CV–1238 as the lead case.

Carolina. *Algonquin II*, 396 B.R. at 108. The bankruptcy cases were subsequently transferred to the Northern District of New York. *Id.* In May 2002, the parties stipulated to, and the district court so ordered, dissolution of the preliminary injunction and then escrow of the malpractice judgment proceeds, hence creation of the malpractice escrow, to be administered as part of the bankruptcy estate. *See id.* The malpractice escrow was protected from disbursement except upon an order of the Bankruptcy Court. *Id.*

In December 2006 Trafalgar filed an adversary complaint seeking a declaration that Algonquin does not have a security interest in the malpractice escrow. *Id.* at 107. The Bankruptcy Court found that Algonquin did not have a security interest in the malpractice escrow and therefore granted Trafalgar's motion for summary judgment and denied Algonquin's motion for summary judgment. *Id.* As noted above, affirmance of the Bankruptcy Court's determinations solely upon collateral estoppel grounds was deemed error by the Second Circuit, and the matter is now ready for consideration of the merits of Algonquin's claim of a security interest in the malpractice escrow.

## III. STANDARD OF REVIEW

In reviewing a bankruptcy court's decision, a district court applies the clearly erroneous standard to conclusions of fact and *de novo* review to conclusions of law. *In re Manville Forest Prods. Corp.*, 209 F.3d 125, 128 (2d Cir.2000); *In re Petition of Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 275 B.R. 699, 703 (Bankr.S.D.N.Y. 2002); Fed. R. Bankr.P. 8013. Conclusions of law made by the Bankruptcy Court are at issue here. Therefore, a *de novo* review will be undertaken.

## IV. DISCUSSION

Algonquin asserts four bases for its contention that the Bankruptcy Court erred in determining that it had no security interest in the malpractice claim and consequently the malpractice escrow. First, it contends that pursuant to the terms of the Indenture, which the parties agree is governed by Connecticut law, Trafalgar assigned its interest in the malpractice claim to Algonquin. Second, according to Algonquin the terms of the Consolidation Agreement, which is governed by New York law according to Trafalgar, conferred upon it an assignment of Trafalgar's interest in the malpractice claim. Third, appellant contends that even if it did not originally have a security interest in the malpractice claim, when the claim transformed into a judgment, bond claim, contract claim, and interest in an escrow account it obtained a security interest. Finally, Algonquin argues that it was error to find that the revised New York Uniform Commercial Code Article 9 ("revised Article 9") was not applicable to the security interest at issue, and that even if it did apply Algonquin still did not have a security interest in the malpractice claim or its proceeds.

### A. Indenture

According to the terms of the Indenture, Trafalgar granted to Algonquin a security interest in the following:

all Property, rights and privileges of the Companies, now owned or hereafter acquired, including (without limitation):

(1) the Property described in Annex 2 . . . ;

(2) all cash now or in the future delivered to the Security Trustee in accordance with the provisions of this Indenture or of any of the Assigned Agreements; and

(3) all of the right, title and interest, powers, privileges and other benefits

of each of the Companies under each and every one of the leases, contracts, permits, licenses, franchises, certificates, insurance policies, warranties, bonds and other agreements (the "Assigned Agreements") to which it is a party or pursuant to which it has been granted rights, including, without limitation, those Assigned Agreements described on Annex 3 . . .;

In each case, together with all proceeds thereof and any replacements, additions, accessions or substitutions thereof or thereto, all after-acquired Property, and all accounts and proceeds arising from the sale and disposition thereof . . . .

It is further agreed that the Security Trustee shall hold any and all other Property and any and all other rights, interests, privileges and positions granted to it in accordance with the provisions hereof, the provisions of the Note Purchase Agreement, the Consolidation Agreement, and the provisions of any other document contemplated hereby or thereby, as security trustee for the holders, from time to time, of the Notes . . . as security for, or as additional sources of payments of, the Indenture Indebtedness, and for the uses and purposes and subject to the terms and provisions set forth in this Indenture.

Indenture at 7–8.

According to Algonquin, Trafalgar assigned to it a security interest in the malpractice claim pursuant to the above-quoted language in the Indenture. In order to determine whether Algonquin holds such a security interest, it must be determined if an interest in an engineering malpractice claim may be assigned under Connecticut law and, if so, whether the language of the Indenture did in fact assign that interest.

▮▮▮ Under Connecticut law, contract claims are assignable. *Gurski v. Rosen-*

*blum & Filan, LLC,* 276 Conn. 257, 885 A.2d 163, 167 (2005). However, it is well settled that a tort claim "for personal injuries cannot be assigned.'" *Id.* at 168 (quoting *Dodd v. Middlesex Mut. Assurance Co.,* 242 Conn. 375, 698 A.2d 859, 864 (1997)). A malpractice action sounds in tort. *See Camposano v. Claiborn,* 2 Conn. Cir.Ct. 135, 196 A.2d 129, 130 (1963). Moreover, malpractice damages are for personal injuries. *Id.* Therefore, under Connecticut law Trafalgar's malpractice claim could not be assigned. *See Gurski,* 885 A.2d at 167.

Algonquin argues that, although not directly decided, a tort claim for property damage could be assigned if doing so would not contravene public policy, and a tort claim reduced to judgment could be assigned. It contends that the malpractice claim was one for property damage and eventually it was reduced to judgment, consequently it could be assigned.

In support it cites *Berlinski v. Ovellette,* 164 Conn. 482, 325 A.2d 239, 242 (1973), *overruled, Westchester Fire Ins. Co. v. Allstate Ins. Co.,* 236 Conn. 362, 672 A.2d 939 (1996). Algonquin relies heavily on the statement that "a right of action for personal injuries resulting from negligence is not assignable before judgment" for its propositions that (1) if the claim is not for personal injuries it can be assigned, and (2) a judgment on a personal injury claim is assignable. *Id.* at 241; *Iseli Co. v. Conn. Light & Power Co.,* 211 Conn. 133, 558 A.2d 966, 967 (1989) (citing *Berlinski* as authority that a tort claim for personal injuries is not assignable before judgment).

The court in *Westchester Fire Insurance* overruled the *Berlinski* Court's finding that subrogation and assignment were indistinguishable. 672 A.2d at 943–46. Rather, it held that equitable subrogation [4]

---

**4.** See *id.* at 944–45 for a discussion of conventional versus equitable subrogation.

in the context of uninsured motorist insurance was not equal to assignment of a personal injury action. *Id.* at 945–46. Therefore, the court concluded that "an uninsured motorist insurance carrier that has paid underinsured motorist benefits to its insured may bring a subrogation action against the tortfeasor's liability insurer" who allegedly denied coverage wrongfully. *Id.* at 940, 945–46.

This line of cases does not lead to resolution of Algonquin's argument in its favor. First, it is doubtful that any conclusions made in the context of the highly-regulated uninsured motorist insurance context are applicable in the engineering malpractice context presented here. *See id.* at 945. Second, the cases are about subrogation of personal injury claims, not assignability of property damage claims or claims reduced to judgments.

Algonquin also cites *Esposito v. CPM Ins. Servs., Inc.*, 50 Conn.Supp. 283, 922 A.2d 343 (2006) in support of its arguments. After reviewing caselaw, the *Esposito* Court restated Connecticut law as follows: contract rights are assignable, personal injury claims are not, and the "gray area of tort claims based on injury to property interests … must be resolved 'on the basis of public policy.'" *Id.* at 350 (quoting *Gurski*, 885 A.2d at 168); *see Starview Ventures v. Acadia Ins. Co.*, No. CV065003463S, 2009 WL 5511543, at *5 (Conn.Super.Ct. Dec. 16, 2009). The court then concluded that policy considerations present in a legal malpractice context were not applicable in the context of a negligence claim by an insured against an insurance agent. *Esposito*, 922 A.2d at 352. Therefore, the court found that the claim against the insurance agent was assignable. *Id.* The *Esposito* Court noted that the "peculiar dynamics of insurance coverage" led to the conclusion that the policies

implicated in *Gurski* were not similarly implicated in the case before it. *Id.* at 350.

These lower court cases indicate that claims for injury to property may be assigned if no public policy considerations militate against assignment. However, Connecticut's highest court has not made such a holding. In any event, consideration of public policy is only necessary where the purportedly-assigned claim is for damage to property.

Unlike the circumstances presented in *Gurski* and *Esposito*, which dealt with injury to property, here the claim was for engineering malpractice. It was not a claim for damage to the property. Algonquin criticizes the Bankruptcy Court's finding that the measure of damages using lost revenue in the malpractice case did not transform the malpractice claim into one alleging property damage. However, Algonquin does not explain how or in what way engineering malpractice is a claim for property damage. The argument that the malpractice claim is one for property damage and therefore is assignable under Connecticut law fails.

Additionally, even if Algonquin is correct that tort claims reduced to judgments may be assigned, the purported assignment in this case was made in 1996, well before the malpractice claim was reduced to judgment, on April 15, 1999. Thus, the malpractice claim and/or judgment was not assigned.

Even if the malpractice claim was assignable under Connecticut law, it would be necessary to analyze whether the Indenture conveyed a security interest in it to Algonquin.

According to Algonquin, the Indenture assigned all of Trafalgar's property to Algonquin as security for the loan. The Indenture defines "property" as "any interest in any kind of property or asset,

whether real, personal or mixed, and whether tangible or intangible, except electricity generated by any Facility." Indenture § 1.1 at 19.

■■■ "[T]o constitute an assignment there must be a purpose to assign or transfer the whole or a part of some particular thing, debt, or chose in action, and the subject matter of the assignment must be described with such particularity as to render it capable of identification." *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 828 A.2d 64, 79 (2003); *Buck v. Seymour*, 46 Conn. 156, 1878 WL 1562, at *11 (Conn.1878) (stating that the "rigid rule of description" generally applicable to assignments may be relaxed in the case of railroads). Assignments may include after-acquired property. *See Buck*, 1878 WL 1562, at *11 (finding language that after-acquired property bought and in use for railroad business sufficiently specific to create assignment). However, in order for the writing to evince a purpose to assign something after-acquired (such as a chose in action) the description must be sufficiently particular such that others who may seek to acquire an interest in the thing would be apprised that it has already been pledged to another. *Id.* For example, the court in *Buck* explained that by description, property acquired in order to run the railroad would be identifiable by any future creditors—they could merely see the property used for running the railroad and know that it had already been pledged. *See id.*

■ The language of the Indenture is sufficiently broad to include an interest in a chose in action. Indenture at 19 (defining property as "any interest in any kind of property or asset . . ."). However, it is not sufficiently particular to identify the malpractice claim as having been pledged as security. Moreover, the broad language of the Indenture pledging "all property" does not evince that the parties' purpose was to pledge the malpractice claim. Given that Trafalgar brought the malpractice action in 1989, and the Indenture was entered into by the parties in 1996, Algonquin was aware of the malpractice action. If the parties had intended to include the malpractice claim in the Indenture, they easily could have included "chose in action" or other language indicating that an outstanding claim was also pledged. Any future creditor could review the Indenture and realize that, for example, equipment used at the hydroelectric power plants was included in the pledge to secure the loan. However, the broad description of "all property" would not enlighten a prospective creditor that the malpractice claim was also pledged, or even that such a claim existed. The language of the Indenture does not describe the property included in the assignment in sufficient particularity to encompass the malpractice claim.[5]

An engineering malpractice claim cannot be assigned under Connecticut law. Moreover, even if Connecticut law permitted assignment of such claims, the Indenture does not identify the malpractice claim as property that is assigned. Therefore, Trafalgar is entitled to a declaration that Algonquin does not hold a security interest in the malpractice claim.

### B. *Consolidation Agreement*

#### 1. *Governing Law*

According to Algonquin, New York law governs the Consolidation Agreement, pursuant to Section 3.6, which states: "This Agreement shall be construed, interpreted,

---

**5.** This is also true of the malpractice judgment. Even if a tort claim is assignable under Connecticut law once it is reduced to judgment, the language of the Indenture was insufficiently particular to include such a judgment in the property assigned.

enforced and governed by and in accordance with the internal laws of the State of New York, without regard to principles of conflict of laws." Consolidation Agreement § 3.6 at 23.[6] Although the Modification Agreement[7] provides that it is governed in accordance with Connecticut law, Algonquin argues that the original Consolidation Agreement providing that New York law governs remains in effect. Algonquin cites the following language from the Consolidation Agreement in support of its argument: "All of the terms and conditions of the Existing Mortgage and the collateral security provided thereby are hereby ratified and confirmed in all respects and shall remain in full force and effect." *Id.* § 5 at 8.

▮ Algonquin fails to point out the following sentence in Section 5, which clearly states that modifications set forth in the Modification Agreement apply to change certain portions of the Consolidation Agreement, but that portions of the Consolidation Agreement not expressly changed by the Modification Agreement remain in full force and effect. This next sentence reads: *"Except as expressly provided herein,* the Existing Mortgage has not been modified, amended, cancelled, terminated, released, satisfied, superseded or otherwise invalidated." Modification Agreement § 5 at 8 (emphasis added). Connecticut law governs the terms of the Consolidation Agreement as modified by the Modification Agreement.

### 2. *Merits of Security Interest under Consolidation Agreement*

The above analysis regarding the assignability of an engineering malpractice claim

such as the one at issue here pursuant to Connecticut law is applicable regarding the Consolidation Agreement. Thus, the conclusion reached—that the malpractice claim at issue here cannot be assigned—is equally valid. *See Gurski,* 885 A.2d at 168. However, it is appropriate to consider whether, if assignment of such a claim was permitted, the Consolidation Agreement would have done so.

▮ Algonquin points to three sections of the Consolidation Agreement as conveying to it a security interest in the malpractice claim. Section 10 states:

TOGETHER WITH all estate, right, title and interest of Trafalgar in and to all awards, settlements and other compensation, and interest thereon, hereafter made in connection with any *condemnation, eminent domain or similar proceeding* or for, or in lieu of, any taking under the power of eminent domain of any of the property described in paragraphs 2, 3, 4, 5, 7 and 8 above, or any part thereof, including, without limitation, *any awards and compensation for* change of grade of streets *or any other injury to or decrease in the value of such property* . . . .

Consolidation Agreement § 10 at 7–8 (emphasis added). Section 10 by its terms plainly applies to condemnation, eminent domain, or similar proceedings from which Trafalgar may obtain an award or compensation. Condemnation and eminent domain are not at issue in this case. Section 12 states:

TOGETHER WITH (a) all estate, right, title and interest of Trafalgar in and to

---

**6.** The applicable portion of the Consolidation Agreement is found in the record at Document 3–3. As with the Indenture, citations will be to the section number, if applicable, with the ECF page number. *See supra* n. 2.

**7.** The applicable portion of the Modification Agreement is in the record at Document 2–8. As with the Indenture and Consolidation Agreement, citations will be to the section number, if applicable, along with the ECF page number. *See supra* nn. 2, 6.

all judgments, insurance proceeds, *awards of damages and other compensation and settlements hereafter made for any damage ... to any of the property described ...* or to any rights appurtenant thereto, all proceeds of any sales or other dispositions of any such property, and all refunds of taxes, assessments, water charges, sewer rents or other impositions hereafter paid in respect of any such property, (b) all contract rights, general intangibles, *actions and rights in action,* including, without limitation, *all rights to insurance proceeds and unearned or refunded insurance premiums, arising from or relating to any of the property* described ... and (c) all *proceeds, products, replacements, additions, substitutions, renewals and accessions of and to any of the property* described . . . .

*Id.* § 12 at 8 (emphasis added). Section 12 by its plain language applies to any awards or compensation for property damage, actions pertaining to insurance proceeds and refunded premiums, and alterations to the property. None of these items is in issue here. Section 14 states:

TOGETHER WITH any and all further or greater estate, right, title, *interest, claim* and demand whatsoever of Trafalgar, *now owned or hereafter acquired,* in or to (a) any of the property described in the foregoing paragraphs, or (b) the Trafalgar Land, the Trafalgar Improvements, the Leasehold Estate, the Permanent Easements or any rights or interests appurtenant to any thereof.

*Id.* § 14 at 9 (emphasis added). As suggested by Algonquin, "it is apparent that the Consolidation Agreement provides the Security Trustee with an interest in anything and everything relating in any way to the Facilities" pursuant to its "expansive language" included the above-quoted sections. Appellants' Brief at 24 (Dkt. No. 11). According to Algonquin, the engineering malpractice decreased that value of the Indenture Estate as defined by the Indenture. Accordingly, it contends that the malpractice claim and its proceeds should be considered part of the estate, all of which was assigned to Algonquin as security for the loan.

■ The definitions in the Indenture apply to the Consolidation Agreement. The Indenture defines property [of the estate] as "any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible, except electricity generated by any Facility." Indenture § 1.1 at 19. As recognized by Algonquin, the Consolidation Agreement constitutes a general assignment, with its expansive language assigning virtually all of Trafalgar's property. Such a general assignment is insufficient to convey a security interest in a thing not specifically described. *See Schoonmaker,* 828 A.2d at 79. Besides being overly broad and thus insufficient to assign an interest in the malpractice claim,[8] the Indenture specifically excepts electricity generated from the definition of "property" assigned to Algonquin.

The malpractice claim arose from the following. Trafalgar hired the engineering firm to assist it with the licensing and proposed development of the hydroelectric power plants. *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 12 (2d Cir.2000). Part of what the engineering

---

8. It is noted that even if New York law governed, the result would be the same, since New York also requires a particular description in order to convey a security interest. *See Israel Discount Bank Ltd. v. Gottesman (In re Ore Cargo, Inc.),* 544 F.2d 80, 81–82 (2d Cir.1976) (applying New York law to find that a general security agreement did not convey a security interest in the claim at issue).

firm did was to prepare an analysis of the estimated cost and energy production capabilities (and thus revenue generation potential) of the power plants in order to assist potential investors in evaluating the financial viability of the project. *Id.* Based at least in part on this analysis, Trafalgar forged ahead with constructing the power plants. *Id.* The power plants were not profitable due primarily to overruns in construction costs and less-than-estimated electricity production. *Id.* at 13.

Trafalgar alleged, inter alia, that the engineering firm miscalculated the head, that is the distance the water drops from the top of the dam down to the trailrace at the bottom of the power plant. *Id.* As a jury found as to two of the power plants,[9] the head was in fact miscalculated, leading to an estimate of a far larger potential energy production than was attained from the completed power plants. *Id.* Indeed, there was no possibility of re-constructing the power plants to increase the head, thus increase power production, because of geographical restrictions, including the topography of the plants' locations. *Id.* at 15. Accordingly, the jury found engineering malpractice with regard to those two plants. *Id.* The measure of Trafalgar's damages was the difference between the (wrongly) estimated electricity production and the actual energy production—that is, lost generation of electricity. In other words, the damages Trafalgar suffered was the value of electricity that would have been generated according the engineering firm's estimates. The Indenture specifically exempts electricity generated from the definition of property assigned to Algonquin. Accordingly, although the Consolidation Agreement as modified assigns virtually all Trafalgar's property to Algon-

quin as security for the loans, the specific property excluded from this assignment pursuant to the Indenture was electricity generated. It follows then that the malpractice claim, judgment, and escrow representing the value of not-generated electricity is excluded from the assignment.

### C. *Security Interest Obtained upon Transformation*

 Algonquin argues that even if it had not obtained a security interest in the malpractice claim, it obtained a security interest in the asset as it transformed to a judgment, bond claim, contract claim, and interest in an escrow account. According to Algonquin, the Indenture granted security interests in all types of assets in which Trafalgar has an interest, specifically contract rights, general intangibles, all accounts and other receivables, as well as performance or other bonds. Algonquin refers to both the New York and Connecticut Uniform Commercial Codes as authority that a security interest can attach to each of these types of assets and can be perfected by filing financing statements. However, none of the cases cited by Algonquin support the proposition that when there is no security interest in a claim, when the claim "transforms" into some other type of asset a security interest attaches.

Algonquin criticizes the Bankruptcy Court's characterization of *Nolin Prod. Credit Ass'n v. Stone (In re Stone)*, 52 B.R. 305 (Bankr.W.D.Ky.1985) as irrelevant. *In re Stone* involved a creditor's properly perfected security interest in calves and their proceeds, although tort settlements were not specifically covered. *Id.* at 306. Debtors obtained a recovery in settlement of a tort action which alleged

---

**9.** The claims as to the other power plants were varyingly resolved. Those resolutions are of no import here.

that defendant veterinarian's negligence caused the death of some 300 calves. The court held that "monies received in settlement of a tort claim for the tortuous damage or destruction of secured collateral are proceeds under the applicable Kentucky Uniform Commercial Code section." *Id.* at 308. Thus, the question in *In re Stone* was whether the tort settlement constituted proceeds from destroyed collateral under the parties' security agreement. *Id.* at 306–08. Unlike *In re Stone,* here the monies at issue derived from engineering malpractice, not negligence that caused damaged or destroyed collateral.

Algonquin also cites *Ramos v. Patrician Equities Corp.,* No. 89 CIV. 5370, 1993 WL 58428 (S.D.N.Y. Mar. 3, 1993) as further support. In *Ramos,* the parties agreed that the settlement proceeds at issue were part of the collateral in which the creditor held a security interest. *Ramos* is inapposite here, where the issue is whether the creditor (Algonquin) has a security interest in the settlement proceeds.

Next Algonquin cites *In re Vienna Park Props.,* 136 B.R. 43, 57 (S.D.N.Y.1992), *aff'd,* 976 F.2d 106 (2d Cir.1992), for the proposition that a contingent right to an escrow fund is a general intangible. As in *Ramos,* the parties agreed that the creditors had a security interest in the assigned contingent right to an escrow fund (i.e., the collateral). *Id.* at 56. Here, however, the creditor (Algonquin) did not have a security interest in the malpractice claim. Further, the question in *Vienna Park Properties* was the classification of the collateral. *Id.* The court found that the assigned contingent right was a contract right, which, under Virginia law, was a general intangible. *Id.* at 57. This does support Algonquin's proposition that a contingent right to an escrow fund is a general intangible. However, it does not follow that a security interest arose upon the malpractice claim

(in which Algonquin did not have a security interest) transforming into a contract right (general intangible). As the Bankruptcy Court so aptly stated, "If the security agreement does not expressly grant a security interest in the underlying tort claim or its proceeds, no subsequent transformation will magically result in an automatic attachment of those proceeds." *Algonquin I,* 377 B.R. at 50.

### D. *Revised New York UCC Article 9*

Algonquin argues that New York's UCC Article 9, revised effective on July 1, 2001, is applicable in this case. Both the Indenture and Consolidation Agreement are governed by Connecticut law, as determined above. Algonquin fails to establish how the New York revised Article 9 should apply when the security agreements are governed by Connecticut law.

Even if the Consolidation Agreement is governed by New York law, as Algonquin contends, the revised Article 9 would not create the security interest as Algonquin proposes.

According to Algonquin, its security interest in the malpractice claim, created prior to the revision of the UCC, is now governed under the revised Article 9 pursuant to § 9–702(b). The revised Article 9 applies to "grants of security interests in commercial tort claims," whereas prior to the revision commercial tort claims were not governed by Article 9. *Algonquin I,* 377 B.R. at 50. The revised Article 9 provides as a general rule that it "applies to a transaction or lien within its scope, even if" the transaction took place or the lien was created before the effective date of the revisions. N.Y. U.C.C. § 9–702(a) & cmt.1 (McKinney's 2002). An exception to the general rule is that if transactions and liens, validly created prior to the revision, were not governed by the previous Article 9, "the rights, duties, and interests

flowing from those transactions and liens remain valid." *Id.* § 9–702(b)(1) & cmt.1. Further, "the transactions and liens may be terminated, completed, consummated, and enforced as required or permitted by Revised Article 9 or by the law that otherwise would apply if Revised Article 9 had not taken effect." *Id.* § 9–702(b)(2). "Revised Article 9 does not affect an action, case, or proceeding commenced before" its effective date. *Id.* § 9–702(c).

■ A security interest in a commercial tort claim which was outside the scope of the prior UCC, such as the purported security interest in this case, falls under the exception and would be governed by § 9–702(b). However, the previously-granted security interest must have been valid. The purported security interest here, against a tort claim, was not valid. Even if a tort claim could properly have been assigned, the language of the governing documents did not sufficiently describe the collateral as including a tort claim. Therefore, the underlying purported security interest would not have been valid and would not have been covered by § 9–702(b).

Algonquin further argues that the Bankruptcy Court erred in determining that even if the revised Article 9 did apply, Algonquin did not have a security interest in the malpractice claim or its proceeds. According to Algonquin, the financing documents (Indenture and Consolidation Agreement) sufficiently identified claims related to a decrease in the value of the facilities, as reflected by the measure of damages in the underlying malpractice claim. However, as determined above, the malpractice damages were measured by the reduced amount of electricity the power plants were capable of producing, rather than a reduction in the value of the power plants (i.e., damage to the collateral). Accordingly, even if the revised Article 9 applied, Algonquin did not hold a

security interest in the malpractice claim or its proceeds.

Finally, Algonquin argues that it held a valid security interest in general intangibles, into which the malpractice claim transformed when it was reduced to judgment, claim on a bond, and a contingent interest in an escrow account. The revised Article 9 does contemplate governing liens against commercial tort claims and their proceeds, whereas the prior Article 9 did not. However, the underlying security interest/lien must have been valid. *See id.* § 9–702 cmt.1 ("Under subsection (b), these *valid* transactions ... *retain* their validity under this Article and may be terminated, completed, consummated, and enforced under this Article.") (emphasis added). As previously discussed, the purported security interest in this case was not valid. Moreover, Algonquin has not cited a single case in which the security agreement did not expressly grant a security interest in the underlying tort claim or its proceeds but a subsequent transformation "magically result[ed] in an automatic attachment of those proceeds." *Algonquin I*, 377 B.R. at 50.

## V. *CONCLUSION*

Under Connecticut law, a malpractice claim cannot be assigned. Even if the malpractice claim could be assigned, the terms of the Indenture were insufficiently specific to assign a security interest in it to Algonquin. Similarly, the terms of the Consolidation Agreement did not assign Trafalgar's interest in the malpractice claim to Algonquin. Transformation of the malpractice claim into a judgment, bond claim, contract claim, and interest in an escrow account did not result in Algonquin holding a security interest in these assets. Finally, the revised Article 9 does not govern the interest at issue because the purported assignment of the underlying tort claim was not valid. Based upon the foregoing, it was proper to grant Trafalgar's

motion for summary judgment and deny Algonquin's motion for summary judgment.

Accordingly, after *de novo* review of the conclusions of law made by the Bankruptcy Court, it is

ORDERED that the October 30, 2007, decision of the Bankruptcy Court is AFFIRMED in its entirety.

IT IS SO ORDERED.